**NESHAMINY SCHOOL DISTRICT,**
**Appellant**

v.

**NESHAMINY FEDERATION**
**OF TEACHERS.**

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 2015.

Decided July 29, 2015.

Reargument Denied Sept. 10, 2015.

Ellis H. Katz, New Britain, for appellant.

Marc L. Gelman, Philadelphia, for appellee.

BEFORE: DAN PELLEGRINI, President Judge, and P. KEVIN BROBSON, Judge, and PATRICIA A. McCULLOUGH, Judge.

OPINION BY Judge PATRICIA A. McCULLOUGH.[1]

The Neshaminy School District (District) appeals from the June 30, 2014 order of the Court of Common Pleas of Bucks County (trial court) denying the District's

---

1. This opinion was reassigned to the author on March 24, 2015.

petition to vacate an arbitration award which sustained a grievance filed by the Neshaminy Federation of Teachers (Federation) regarding lost pay on June 12, 2012.

### Facts/Procedural History

The following facts are not in dispute. The District and the Federation are parties to a collective bargaining agreement (CBA) which expired in 2008. After four years of working without a contract, the Federation went on strike in January 2012 (first strike), during the 2011–12 academic year. Following the first strike, the parties proceeded to non-binding arbitration, after which the Federation commenced another strike on June 4, 2012 (second strike). The Secretary of Education sought an injunction in the trial court under the Public School Code of 1949 (Code),[2] alleging that if the Federation's members did not return to work by June 15, 2012, or June 16, 2012,[3] the District would be unable to provide 180 days of instruction by June 30, 2012, in violation of Section 1161–A of the Code.[4]

Following a hearing, on June 11, 2012, the trial court issued an injunction enjoining the Federation's members from continuing their strike beyond June 14–15,

2012. While still in the courtroom after the injunction was issued, between 11:00 a.m. and 12:15 p.m., the Federation advised the District that it was no longer on strike and that its membership was prepared to return to school the following day. In response, the District advised that there was insufficient time to open school on June 12, 2012, but that it would reopen on June 13, 2012.[5]

### Arbitration

Following its members' return to work on June 13, 2012, the Federation filed a grievance, alleging that the District failed to provide its members one day's pay at their individual, per diem rates when it refused to allow the members to return to work on June 12, 2012, thereby creating a *de facto* lockout. The grievance proceeded to arbitration, and a hearing was held before Thomas G. McConnell, Jr. (the Arbitrator), at which Louis Muenker, the District's then-Superintendent, testified regarding the infeasibility of reopening the District's schools on June 12, 2012, due to the short notice provided.[6] Specifically, he stated that transportation, food services, and air-conditioning regulation could not be arranged for the students in time. (Reproduced Record (R.R.) at

---

**2.** Act of March 10, 1949, P.L. 30, *as amended*, 24 P.S. §§ 1–101–27–2702.

**3.** Kindergarten students needed to return to school by June 15th and the remainder of the student population needed to return by June 16th.

**4.** Section 1161–A of the Code provides:
 When an employe organization is on strike for an extended period that would not permit the school entity to provide the period of instruction required by section 1501 by June 30, the Secretary of Education may initiate, in the appropriate county court of common pleas, appropriate injunctive proceedings providing for the required period of instruction.

24 P.S. § 11–1161–A, *added by* the Act of July 9, 1992, P.L. 403. Section 1501 of the Code further specifies that kindergarten, elementary, and secondary pupils must be provided 180 days of instruction each school year. 24 P.S. § 15–1501.

**5.** The District has 8,500 students, 650 faculty, 1,250 total employees, and 12 buildings consisting of 8 elementary schools, 3 middle schools, and 1 high school.

**6.** Because hearing transcripts have not been included in the reproduced record, we rely upon the Arbitrator's characterization of the testimony, which neither party disputes.

120a.) Additionally, with respect to the possibility of having only the staff come in on June 12, as proposed by the Federation's Local President, Louise Boyd, in emails to him later on June 11, Dr. Muenker testified that there was not enough time to produce meaningful professional development plans, that Boyd's email did not address nurses, librarians, or elementary staff, and that it would not be "particularly satisfactory" to have the teachers "do nothing." *Id.*

On cross-examination, Dr. Muenker stated that aside from the fact that in-service days are typically geared toward providing continuing-education credits, there were no requirements setting minimum standards for the agenda of an in-service day. Additionally, he acknowledged receipt of President Boyd's June 11 emails. (R.R. at 120a–21a.)

In support of the Federation's grievance, President Boyd, who also serves as a biology teacher for the District, stated that after she advised Dr. Muenker that the staff was prepared to return to work on June 12th, he advised that the District would reopen on the 13th. In follow up, President Boyd suggested an in-service day, but was informed by a District repre-sentative that "the staff would return when the students were scheduled to return, on the 13th." (R.R. at 121a.)

Following the hearing, the Arbitrator issued an order (Award) sustaining the grievance and directing the District to make the Federation's members whole for any lost wages they incurred with regard to June 12, 2012. The Arbitrator reasoned that the District effectuated a constructive lockout on June 12th by disallowing its staff to return to work. While recognizing that Section 1101–A of the Code [7] provides an exception for closures that are not to be considered lockouts, the Arbitrator concluded that the District's conduct did not fall within the exception's language because the exception pertains only to cancellations at the beginning of a strike and not at the end of a strike, as occurred here.

Further, the Arbitrator concluded that the District breached the implied covenant of good faith and fair dealing when it precluded the Federation's members from working on June 12, 2012, and thereby precluded them from being paid for working the contractual "normal work year" under Article X, Section 10–26 of the

7. Section 1101–A of the Code provides:
 "**Strike**" shall mean concerted action in failing to report for duty, the wilful absence from one's position, the stoppage of work, slowdown or the abstinence, in whole or in part, from the full, faithful and proper performance of the duties of employment for the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment. The employe organization having called a strike once and unilaterally returned to work may only call a lawful strike once more during the school year. A written notice of the intent to strike shall be delivered by the employe organization to the superintendent, executive director or the director no later than forty-eight (48) hours prior to the com-mencement of any strike, and no strike may occur sooner than forty-eight (48) hours following the last notification of intent to strike. *Upon receipt of the notification of intent to strike, the superintendent, executive director or the director may cancel school for the effective date of the strike. A decision to cancel school may, however, be withdrawn by the superintendent, executive director or the director. Any subsequent change of intents to strike shall not affect the decision to cancel school on the day of the intended strike. For the purposes of this article, the decision to cancel school on the day of the intended strike shall not be considered a lockout.*
 24 P.S. § 11–1101–A (emphasis added), *added by* Act of July 9, 1992, P.L. 403.

CBA.[8] While finding that Dr. Muenker provided compelling testimony as to why the District was not prepared to receive students on June 12th, the Arbitrator emphasized that Dr. Muenker failed to so much as consult his cabinet members or other administrators regarding whether it would have been productive for the staff to have an in-service day and therefore "did not exhibit any effort to investigate" possibilities other than total closure on June 12th. (R.R. at 130a.)

## Trial Court

The District subsequently filed a petition to vacate the Award with the trial court, contending that it does not draw its essence from the CBA and violates public policy insofar as the Arbitrator found that: (1) Dr. Muenker was required to confer with his cabinet prior to deciding that the staff would not work on June 12, 2012; (2) a constructive lockout occurred on June 12, 2012; (3) the District violated the covenant of good faith and fair dealing; and (4) the District was obligated to schedule a work

day on June 12, 2012, and pay its staff for the day.

■■■ Applying the essence test,[9] the trial court found that the issue concerning wages and compensation due for June 12, 2012, fell within the terms of the CBA, specifically Article X, Sections 10–25 and 10–26 dealing with the normal work day and normal work year.

Regarding the second prong of the essence test, the trial court determined that the Award could be construed as being rationally derived from the CBA. The trial court explained that the Arbitrator's interpretation of Section 1101–A was based upon the plain language of the CBA and was not contrary to law. The trial court concluded that the Arbitrator's finding that the District violated the implied covenant of good faith and fair dealing was based on the District's violation of Article X, Section 10–26 setting the work year. Finally, the trial court clarified that the Arbitrator did not conclude the District was *required* to schedule a work day on June 12, 2012, but only to use due dili-

---

8. Article X provides, in relevant part:

 **10–25 NORMAL WORK DAY**
 **10–25.1** The normal work day for classroom teachers is seven (7) hours except on those days when their professional services are needed at conferences and meetings. This may be a flexible seven (7) hour schedule.

 \* \* \*

 **10–26 NORMAL WORK YEAR**
 **10–26.1** The Salary Schedule identified as "Appendix A" attached to this Agreement are based on 188.5 days of service.
 **10–26.2** As used herein, the term "National Work Year" shall mean 188.5 days of service. . . .
 (R.R. at 45a–46a.)

9. Under the essence test, courts engage in a two-pronged approach to reviewing arbitration awards:

 First, the court shall determine if the issue as properly defined is within the terms of

the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA),* 560 Pa. 135, 743 A.2d 405, 413 (1999). In this way, a court may not substitute an arbitrator's interpretation of the contract language with its own and may not engage in merit review of the matter. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA,* 595 Pa. 648, 939 A.2d 855, 863 (2007).

gence in *considering* whether the day should be used for in-service.

## Issues

On appeal to this Court, the District argues that the Arbitrator's Award, insofar as the Arbitrator concluded that a constructive lockout occurred on June 12, 2012, and that the District violated the covenant of good faith and fair dealing, violates public policy and/or fails to draw its essence from the CBA. We agree.

## Discussion

### Essence Test

 As noted above, grievance awards under the Public Employe Relations Act [10] are reviewed under the deferential essence test, which requires an award to be confirmed if: (1) the issue as properly defined is within the terms of the agreement, and (2) the award can be rationally derived from the agreement. *Fraternal Order of Transit Police v. Southeastern Pennsylvania Transit Authority*, 114 A.3d 893 (Pa.Cmwlth.2014). A reviewing court will not second-guess the arbitrator's fact-finding or interpretation as long as the arbitrator has arguably construed or applied the CBA. *Id.* We have often equated the essence test with the judgment n.o.v./error of law concept set forth in section 7302(d)(2) of the Uniform Arbitration Act (UAA), 42 Pa.C.S. § 7302(d)(2). *Id.; see also Tunkhannock Area School District v. Tunkhannock Area Education Association*, 992 A.2d 956, 958 (Pa. Cmwlth.2010).

 Section 7302(d)(2) of the UAA provides, in pertinent part, that a court reviewing an arbitration award shall "modify or correct the award where the award is contrary to law and is such that had it

been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict." Judgment n.o.v. "may be entered where (1) the moving party is entitled to judgment as a matter of law or (2) the evidence is such that no two reasonable minds could disagree that judgment was due to the moving party." *White v. City of Philadelphia*, 102 A.3d 1053, 1057 (Pa.Cmwlth. 2014).

### Constructive Lockout

██ ██ The District first argues that the Arbitrator's Award, insofar as the Arbitrator concluded that the District engaged in a constructive lockout on June 12, 2012, when the District declined to schedule work on that day, violates public policy. Under the public policy exception to the essence test, a court should not enforce a grievance arbitration award when it contravenes a "well-defined, dominant" public policy, as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland Intermediate Unit No. 7*, 939 A.2d at 865–66.

As the trial court noted, the issue concerning wages and compensation due for June 12, 2012, fell within the terms of the CBA, specifically Article X, Sections 10–25 and 10–26 dealing with the normal work day and normal work year. However, in reaching his determination that the District engaged in a constructive lockout, the Arbitrator went beyond the terms of the CBA and relied on his interpretation of section 1101–A of the Code,[11] which sets forth definitions of the terms "[l]ockout" and "[s]trike."

A "[s]trike" is defined, in pertinent part, as a:

---

10. Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. §§ 1101.101–1101.2301.

11. Added by the Act of July 9, 1992, P.L. 403, 24 P.S. § 11–1101–A.

[C]oncerted action in failing to report for duty, the willful absence from one's position, the stoppage of work, slowdown or the abstinence, in whole or in part, from the full, faithful and proper performance of the duties of employment for the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment ... A written notice of the intent to strike shall be delivered by the employe organization to the superintendent, executive director or the director no later than forty-eight (48) hours prior to the commencement of any strike, and **no strike may occur sooner than forty-eight (48) hours following the last notification of intent to strike. Upon receipt of the notification of intent to strike, the superintendent, executive director or the director may cancel school for the effective date of the strike. A decision to cancel school *may,* however, be withdrawn by the superintendent, executive director or the director.** *Any subsequent change of intents to strike shall not affect the decision to cancel school on the day of the intended strike. For the purposes of this article, the decision to cancel school on the day of the intended strike shall not be considered a lockout.*

24 P.S. § 11–1101–A (emphasis added). The Arbitrator interpreted this "strike" language as only applying to the commencement, not the end of, a strike.

However, this interpretation ignores the express language of section 1101–A relating to a "[s]trike" and, hence, is contrary to public policy. Moreover, although a strike may not occur sooner than 48 hours following notification of intent to strike, thus providing school districts with at least 48 hours' notice to prepare for a strike, the Federation essentially argues that the District must revoke a cancellation of the school day in less than 24 hours.

The District received notice that the Federation intended to strike on June 4, 2012, and, in accordance with section 1101–A, the Superintendent cancelled school. A strike is not a single-day event but continues for so long as the teachers choose not to report for work. Such a characterization is consistent with the General Assembly's use of the plural "intents to strike" instead of "intent" and its reference to *"A* decision" rather than *"The* decision" to cancel school in section 1101–A.

The District believed that the Federation would continue with its strike until at least June 14, the last day that the parties stipulated in the injunction proceedings that the Federation could strike in relation to kindergarten students and still meet the required 180 days of education. The District only learned of the Federation's intent to cancel the strike and return to work on June 12 around noon the preceding day. For reasons explained above, the Superintendent exercised his discretion pursuant to section 1101–A ("A decision to cancel school *may,* however, be withdrawn by the superintendent....") in not withdrawing the cancelled school day of June 12, a date of the intended strike, having been given less than a day's notice of the cancellation of the strike. The Superintendent exercised his discretion pursuant to statutory authority to evaluate whether the District would be ready to reopen on such short notice. Moreover, the Superintendent's actions were consistent with section 1101–A, which states that "[a]ny subsequent change of intents to strike shall not affect the decision to cancel school on the day of the intended strike."

The Federation further asserts, and the Arbitrator found, that the Superintendent's exercise of discretion was in effect a

lockout. This interpretation does not derive its essence from the terms of the CBA, as section 1101–A specifically provides that "the decision to cancel school on the day of the intended strike shall *not* be considered a lockout." A "[l]ockout" is defined as "the cessation of furnishing work to employes or withholding work from employes **for the purpose** of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment." 24 P.S. § 11–1101–A (emphasis added). The words "for the purpose" carry express meaning. "Purpose" is defined as "[a]n objective, goal, or end." Black's Law Dictionary 1271 (8th ed. 2004). The principles of statutory construction require that we give meaning to every word, sentence, or provision of a statute. Section 1921(a) of the Statutory Construction Act, 1 Pa.C.S. § 1921(a); *Meade v. City of Philadelphia*, 65 A.3d 1031, 1037 (Pa.Cmwlth.2013).

There is no evidence in the record to support the conclusion that the District's actions in this case meet the definition of a "[l]ockout." To the contrary, the record indicates that the Superintendent exercised his discretion based on the lack of adequate time to prepare, which in turn was based on his evaluation of a number of noted reasons, including issues relating to transportation, food services, and regulation of air-conditioning.

The record is also completely devoid of any evidence that not withdrawing the decision to cancel school on June 12 was "for

the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment." 24 P.S. § 11–1101–A. In other words, there is nothing in the record to suggest that the Superintendent's objective, goal, or end in not withdrawing the cancelled school day on June 12 was to induce, influence, or coerce a change in the conditions, compensation, or the rights, privileges, or obligations of employment. Rather, the decision to cancel school on June 12 was premised on the Federation's indicated intent to continue its strike on that day.

Because the Arbitrator ignored and/or misinterpreted the express language of section 1101–A of the Code, the Award, insofar as it concludes that the District engaged in a constructive lockout on June 12, 2012, is contrary to public policy.[12]

### Covenant of Good Faith and Fair Dealing

■ Next, the District argues that the Award does not draw its essence from the CBA insofar as it concludes that the District violated the covenant of good faith and fair dealing. The Arbitrator relied on the Superintendent's failure to engage in consultation with his cabinet members or other administrators regarding the opening of the school on June 12 to hold that the District had breached the covenant of good faith and fair dealing. The trial court likewise relied on such failure in denying the District's petition to vacate the Arbitrator's Award.

**12.** Contrary to the dissent, the Majority does not impose upon the Federation a duty to provide 48 hours' notice to the District of its intent to cancel a strike. Rather, the Majority simply cites the 48 hour requirement in section 1101–A of the Code, upon which the Arbitrator relied, to emphasize the unreasonableness of requiring the District to notify its 8,500 students, 650 faculty, and 1,250 total employees, and prepare its 12 school build-

ings for reopening in less than 24 hours. Such determination does not, as the dissent alleges, merely advance the general considerations of supposed public interests. In addition, the dissent ignores the discretion afforded to the Superintendent under this section to withdraw a decision to cancel school, as well as this section's definition of the term "[l]ockout."

However, the Arbitrator recognized in his decision that the covenant of good faith and fair dealing "must spring from some specific allegation of a violation of the CBA" and that, "[t]ypically, the covenant is used to examine the discretion a party has in relation to a given issue." (R.R. at 128a) (citations omitted). Yet, the Arbitrator and the trial court fail to cite any provision of the parties' CBA requiring the Superintendent to engage in consultation with others before making decisions. At most, the Arbitrator referenced an unidentified provision in the CBA which required the *parties, i.e.,* the District and the Federation, not the Superintendent and his cabinet or other administrators, to collaborate on the issue of in-service days.

By essentially reading a new provision into the CBA, *i.e.,* requiring the Superintendent to meet with his cabinet, the Arbitrator exceeded his jurisdiction and authority, which is limited to interpreting the terms of the CBA. Indeed, without citing any specific provision of the CBA, the Arbitrator stated that the Superintendent "**could** at the very least have convened a meeting of his Cabinet to discuss the matter, and to 'brainstorm' on the issue, and **possibly** include administrators who had experience with in-service days ... Certainly further collaboration **might** have yielded some creative ways of using the time on June 12, 2012." (R.R. at 129a) (emphasis added).

This Court recently addressed a similar situation in *City of Pittsburgh v. Fraternal Order of Police Fort Pitt Lodge No. 1,* 111 A.3d 794 (Pa.Cmwlth.2015). In that case, two police officers with the City of Pittsburgh were assigned to direct traffic at multiple sporting events while on duty and paid in accordance with the CBA executed by the City and the police officer's union. The police officers later filed grievances alleging that off-duty police officers performing the same job were paid at a higher, secondary employment rate of pay.[13] The City denied the grievances and the matter proceeded to grievance arbitration. The arbitrator ultimately issued an award sustaining the grievances and directing the City to pay on-duty police officers working large events the same rate being paid to off-duty officers working those events as secondary employment. The arbitrator concluded that it was unfair to pay on-duty officers less than those working secondary employment.

On appeal, the common pleas court vacated the award and dismissed the grievances. The common pleas court held that the arbitrator exceeded his authority because the award was not rationally related to the terms and conditions of the CBA and infringed on the City's managerial prerogative to negotiate the compensation for on-duty officers. The common pleas court noted that the arbitrator disregarded the CBA's compensation terms and "instead made a judgment as to what the CBA *should* say as opposed to what it *actually* says." *Id.* at 798 (emphasis in original). The common pleas court also noted that the arbitrator could not point to any language in the CBA to support his analysis. This Court affirmed the common pleas court's order, stressing that the arbitrator lacked the authority to read new terms into the CBA and direct the City to "do something that had not been bargained with the Union...." *Id.* at 802.

---

**13.** The CBA sets forth the on-duty compensation rate for basic compensation, longevity pay, shift differential pay, overtime pay, and holiday pay. The CBA also sets forth the off-duty compensation rate for secondary employment, $41.12 per hour (equivalent to the overtime rate for a fourth year police officer), and is paid directly by the secondary employer.

Here, because the Superintendent exercised his statutory discretion in deciding not to open the school on June 12 and no provision of the CBA required him to consult with his cabinet members or other administrators before making such a decision, the Award, insofar as it concludes that the District breached the covenant of good faith and fair dealing, does not draw its essence from the CBA.[14]

## Conclusion

Having concluded that the Arbitrator's Award violates public policy and fails to draw its essence from the CBA, the trial court's order is reversed and the Award of the Arbitrator is vacated.

## ORDER

AND NOW, this 29th day of July, 2015, the order of the Court of Common Pleas of Bucks County, dated June 30, 2014, is hereby reversed. The Arbitrator's Award, sustaining a grievance filed by the Neshaminy Federation of Teachers, is vacated.

DISSENTING OPINION BY President Judge DAN PELLEGRINI.

The majority reverses the Court of Common Pleas of Bucks County's (trial court) order affirming the Arbitrator's decision that the Neshaminy School District (District) arbitrarily decided not to have a "work day" and thereby deprived teachers of being paid for a "normal work year."[1] It does so because it finds that the Arbitrator's decision was not in accord with public policy as the teachers were required to give more notice that they intended to return to work from their strike, and that there was no requirement for the District's Superintendent to consult with anyone before deciding not to reopen school. Because I find that neither reason proffered by the majority is a valid basis for determining that the Arbitrator's award was not derived from the essence of the CBA, I respectfully dissent.

### I.

The underlying facts are as follows. The Federation commenced a strike on June 4, 2012. One week later, on June 11, 2012, the trial court enjoined the Federation's members from continuing their strike beyond June 14–15, 2012. While still in the courtroom after the injunction

14. Contrary to the dissent, the Majority does not misconstrue the Award or the trial court's decision insofar as it states that neither the Arbitrator nor the trial court could point to any provision of the parties' CBA requiring the Superintendent to consult with others before making decisions. Indeed, the Majority does not dispute, as the dissent notes, that a duty of good faith and fair dealing impliedly exists in every contract. However, in this case, both the Arbitrator and the trial court specifically relied on the Superintendent's failure to consult others regarding the opening of school on June 12, 2012, in concluding that the Superintended breached the covenant of good faith and fair dealing. As the Majority notes, the Arbitrator essentially read a new provision into the CBA, which exceeded his jurisdiction and authority, and resulted in his Award not drawing its essence from the CBA.

1. The District and the Neshaminy Federation of Teachers (Federation) are parties to a collective-bargaining agreement (CBA) which expired in 2008. Article X of the CBA provides:

**10–25 NORMAL WORK DAY**
**10–25.1** The normal work day for classroom teachers is seven (7) hours except on those days when their professional services are needed at conferences and meetings. This may be a flexible seven (7) hour schedule.

\* \* \*

**10–26 NORMAL WORK YEAR**
**10–26.1** The Salary Schedule identified as "Appendix A" attached to this Agreement are based on 188.5 days of service.
**10–26.2** As used herein, the term "National Work Year" shall mean 188.5 days of service. . . .
(Reproduced Record [R.R.] at 45a–46a.)

was issued, between 11:00 a.m. and 12:15 p.m., the Federation advised the District that it was no longer on strike and that its membership intended to return to work the next day. The District, acting through its then-Superintendent Louis Muenker, advised that there was insufficient time to open school for the students or even for an in-service day on June 12, 2012, but that it would reopen on June 13, 2012.

After its members returned to work on June 13, 2012, the Federation filed a grievance, alleging that the District created a *de facto* lockout when it disallowed members to return to work on June 12, 2012, and seeking recovery of its members' pay for this day.

Before the Arbitrator, Superintendent Muenker testified that it was not feasible to reopen the District's schools on June 12, 2012, due to the short notice provided. He cited concerns with making timely arrangements for transportation, food services and air-conditioning, and stated that although the staff could have used the day for professional development, there was not enough time to develop meaningful plans.

On cross-examination, Superintendent Muenker admitted that he did not consult his cabinet members or other administrators in making this decision and that aside from the fact that in-service days are typically geared toward providing continuing-education credits, there were no requirements setting minimum standards for the agenda of an in-service day. He further conceded that he received two e-mails from the Federation's Local President, Louise Boyd, proposing possible plans for the day but stated that those plans did not address nurses, librarians or elementary staff.

Based on those facts, the Arbitrator found that the District effectuated a constructive lockout on June 12, 2012, by disallowing its staff to return to work. While recognizing that certain closures are not to be considered lockouts under Section 1101–A of the Public School Code of 1949 (Code),[2] the Arbitrator concluded that the District's conduct did not fall within the exception which pertains only to cancellations at the beginning of a strike and not at the end of a strike. The Arbitrator further determined that the District's preclusion of the Federation's members from working on June 12, 2012, breached the District's implied covenant of good faith because it disallowed them from working

---

2. Section 1101–A of the Code provides:

"**Strike**" shall mean concerted action in failing to report for duty, the wilful absence from one's position, the stoppage of work, slowdown or the abstinence, in whole or in part, from the full, faithful and proper performance of the duties of employment for the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment. The employe .organization having called a strike once and unilaterally returned to work may only call a lawful strike once more during the school year. A written notice of the intent to strike shall be delivered by the employe organization to the superintendent, executive director or the director no later than forty-eight (48) hours prior to the commencement of any strike, and no strike may occur sooner than forty-eight (48) hours following the last notification of intent to strike. *Upon receipt of the notification of intent to strike, the superintendent, executive director or the director may cancel school for the effective date of the strike. A decision to cancel school may, however, be withdrawn by the superintendent, executive director or the director. Any subsequent change of intents to strike shall not affect the decision to cancel school on the day of the intended strike. For the purposes of this article, the decision to cancel school on the day of the intended strike shall not be considered a lockout.*

Act of March 10, 1949, P.L. 30, 24 P.S. § 11–1101–A (emphasis added), *added by* Act of July 9, 1992, P.L. 403.

and being paid for the contractual "normal work year" under Article X, Section 10–26 of the CBA. In so ruling, the Arbitrator explained that Superintendent Muenker failed to so much as consult his cabinet members or other administrators regarding whether it would have been productive for the staff to have an in-service day and, therefore, "did not exhibit any effort to investigate" possibilities other than total closure on June 12, 2012. (R.R. at 130a.)

On appeal, the trial court applied the essence test and affirmed the award, finding that the issue fell within Article X, Sections 10–25 and 10–26 of the CBA, and that the award could be construed as being rationally derived from the CBA because the Arbitrator's interpretation of Section 1101–A of the Code was consistent with the provision's plain language and law. With respect to the covenant of good faith, the trial court held that the District violated this duty regarding its implementation of Article X, Section 10–26, setting the work year, by failing to use due diligence in *considering* whether June 12, 2012, should be used for in-service.

The majority finds that the Arbitrator's award does not derive from the essence of the CBA because requiring the District to provide a work day after only one day's notice violates public policy and because nothing in the CBA requires the Superintendent to engage in consultation with others before making decisions about whether to open school. I disagree for the following reasons.

## II.

### A.

The majority finds a violation of public policy based upon Section 1101–A of the Code, 24 P.S. § 11–1101–A, providing that

when a union gives 48 hours' written notice of its intent to strike but decides not to strike, that the Superintendent's decision to cancel school for the effective date of the strike shall not be considered a lockout. According to the majority, Section 1101–A of the Code must mean that a union is also required to give 48 hours' notice of its intent to return from a strike because otherwise, it places the District at the mercy of the Federation's decision to return to work without adequate notice. This leads the majority to conclude that the Arbitrator's award finding a lockout must be against public policy.

I disagree with the majority because for an Arbitrator's decision to be against public policy, it must be against a "well-defined, dominant" public policy, as "ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association,* 595 Pa. 648, 939 A.2d 855, 865–66 (2007). The District has not invoked any such public policy that would place this issue within the purview of the public policy exception by merely alleging that the Arbitrator's construction of Section 1101–A puts it at the Federation's mercy. In fact, the majority applies the public policy exception by doing exactly what the exception prohibits: advancing general considerations of supposed public interests. It made a judgment not on what the General Assembly said regarding ending of strikes but what it believes the General Assembly should have said. By relying on the public policy exception in this situation, the majority transforms the essence test's standard from the equivalent to the judgment n.o.v. standard [3] to a

---

**3.** The Uniform Arbitration Act (UAA) explicit-

ly sets forth the scope of judicial review of

"I do not like the result" standard, rendering the essence test idiosyncratic, to say the least.

### B.

The Arbitrator's conclusion that the District created a lockout derives its essence from the terms of the CBA and is not against public policy. The Arbitrator duly noted that Section 1101–A of the Code governs the notice the Federation was required to provide the District in order to *commence* its strike, not to end a strike.[4] Indeed, the provision concerns a bargaining unit's *intent* to strike and explains, "Any subsequent *change of intents* to strike shall not affect the decision to cancel school on the day of the intended strike." Section 1101–A of the Code, 24 P.S. § 11–1101–A (emphasis added). In other words, if unit members change their minds about striking after issuing notice and the District has already cancelled school, the District need not reschedule school.[5]

However, a strike ends and turns into a lockout when employees are no longer engaged in a "stoppage of work" or "willful[l] absence from [their] positions," but when a school district "withhold[s] work from employe[e]s," despite their willingness to return, regardless of why the closure initially began. Section 1101–A of the Code, 24 P.S. § 11–1101–A.[6] In this respect, the Arbitrator ruled that there may be periods of transition between strikes ending and schools reopening in which neither a strike nor a lockout occurs, but which periods the school district needs to prepare for the reopening of its doors. In determining whether the District needed time to prepare, the Arbitrator looked to see whether the District exercised good faith in reimplementing the "normal work year" set forth in Article X, Section 10–26 of the CBA.

The Arbitrator found that the District engaged in a constructive lockout and did

---

public sector agreements, including grievance-arbitration under collective bargaining agreements entered pursuant to the Public Employe Relations Act (PERA), Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301. 42 Pa.C.S. § 7302 provides how the UAA applies to all arbitrations entered into by a governmental agency. Subsection (d)(2) provides: "[A] court in reviewing an arbitration award pursuant to this subchapter shall, notwithstanding any other provision of this subchapter, modify or correct the award where the award is contrary to law and is such that had it been a verdict of a jury the court would have entered a different judgment or a judgment notwithstanding the verdict." 42 Pa.C.S. § 7302(d)(2); *see also Community College of Beaver County v. Community College of Beaver County, Society of the Faculty (PSEA/NEA),* 473 Pa. 576, 375 A.2d 1267, 1272 (1977).

**4.** Section 1101–A is silent regarding what notice, if any, is necessary to end a strike.

**5.** Regardless, there is no evidence of record indicating that the Federation ever notified

the District of its intent to strike on June 12, 2012. The majority opinion references the District's *belief* "that the Federation would continue with its strike until at least June 14," based upon the parties' stipulation in the injunction proceedings that this was the last day the Federation was legally permitted to strike under Section 1161–A of the Code, 24 P.S. § 11–1161–A, *added by* the Act of July 9, 1992, P.L. 403. (Majority Opinion, at 475.) However, this stipulation addresses only the Federation's legal options and not its actual intent or the notice it provided. Therefore, because there is no evidence that the Federation notified the District of its intent to strike on June 12, 2012, the District's cancellation of school on this day is not insulated under Section 1101–A of the Code. *See* 24 P.S. § 11–1101–A ("For the purposes of this article, the decision to cancel school *on the day of the intended strike* shall not be considered a lockout." (emphasis added)).

**6.** A contrary ruling would enable a school district to effectuate a lockout under the guise of a strike.

not exercise good faith because, at a minimum, Superintendent Muenker was required to engage in due diligence to determine whether the District's staff *could* return that day. Noting that Superintendent Muenker took no steps in this regard in that he did not consult the members of his cabinet, did not discuss the issue with other administrators, and did not consider President Boyd's proposal of an in-service day, the Arbitrator found that he failed to exercise the requisite diligence. Because a determination regarding whether or not a party dealt in good faith is completely within an Arbitrator's ken, I would find that the Arbitrator's interpretation of Section 1101–A of the Code is consistent with its plain language and that his rationale draws its essence from the CBA.

### C.

The majority also finds that the award did not draw itself from the essence of the CBA because it found nothing in the contract requiring the Superintendent to consult with anyone to determine whether it would be feasible to schedule a teacher work day. In effect, the majority holds that it is within the Superintendent's sole discretion whether to have a school day, even if everyone agrees that an in-service day could be scheduled.

In this case, the Arbitrator found that the District violated the covenant of good faith insofar as it, acting through its Superintendent, failed to engage in due diligence to decide whether to reopen its schools on June 12, 2012. In reviewing Section 10–26 in conjunction with the duty of good faith implicit in contracts, the Arbitrator determined that the District was precluded from refusing to reopen its schools after they had been closed due to a strike notwithstanding Section 1101–A of the Code, unless its decision was formed following the exercise of due diligence. In

other words, he held that the District cannot convert what started as a strike into a lockout by failing, in bad faith, to reopen during a period in which school was originally cancelled.

The majority misconstrues the award and the trial court's decision insofar as it holds that they "fail to cite any provision of the parties' CBA requiring the Superintendent to engage in consultation with others before making decisions." (Majority Opinion, at 476.) Indeed, "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." *Agrecycle, Inc. v. City of Pittsburgh,* 783 A.2d 863, 868 (Pa. Cmwlth.2001) (quoting Restatement (Second) of Contracts § 205 (1981)), *appeal denied,* 568 Pa. 687, 796 A.2d 319 (2002). The good-faith duty is an *implied* duty of honesty in carrying out the transaction concerned and allows enforcement of the contract terms in a manner consistent with the reasonable expectations of the parties. *Id.* Examples of "bad faith" include "lack of diligence" and "failure to cooperate in the other party's performance," among others. Restatement (Second) of Contracts § 205, *cmt. d.* Importantly, a cause of action for breach of the implied duty of good faith exists only where the complainant does not have a separate cause of action for breach of express contract terms. *Agrecycle, Inc.,* 783 A.2d at 868.

Therefore, I disagree with the majority's assertion that the duty of good faith could have been breached only if there existed a provision in the CBA requiring the Superintendent to engage in consultation with others before making decisions. If such a provision did exist, there would be no violation of the duty because there would exist an independent cause of action for breach of an express contract provision. In assessing the duty of good faith, we

concern ourselves not with the express provisions but with implied duties.

To that end, the Arbitrator and trial court did point to provisions of the CBA with regard to which they found that the District did not exercise good faith. Specifically, they held that the District failed to exercise due diligence in implementing the "normal work day" and "normal work year" under Article X, Sections 10–25 and 10–26 of the CBA. The Arbitrator and trial court did not conclude, as the majority asserts, that the District was *required* to consult with the School Board before rendering a decision, but rather indicated that such action would be an indicium of good faith. Certainly, the District was free to put forth other relevant evidence of its due diligence, but it offered none, and, therefore, the tribunals below found that the District did not satisfy its implied duty. Contrary to the majority's holding, I do not find that the decisions below "made a judgment as to what the CBA *should* say as opposed to what it *actually* says." (Majority Opinion, at 477.) Rather, they merely imposed the well-established contractual principle of good faith, which by its very definition, is not a duty appearing in the express CBA terms.

Accordingly, for the reasons discussed above, I would affirm the trial court's decision.