# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Millcreek Township School District, : 
                           Appellant : 
                                      : 
                v.                   : 
                                        : 
Millcreek Township Educational :   No. 187 C.D. 2017
Support Personnel Association :   Argued: November 14, 2017

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE J. WESLEY OLER, JR., Senior Judge

OPINION BY
JUDGE COVEY                                         FILED: February 13, 2018

Millcreek Township (Township) School District (District) appeals from the Erie County Common Pleas Court's (trial court) January 30, 2017 order affirming the November 7, 2016 arbitration award (Award) and granting the Township Educational Support Personnel Association's (Association) grievance that the District violated the parties' Collective Bargaining Agreement's (CBA) subcontracting clause. Essentially, the District presents two issues for this Court's review: (1) whether the Award satisfies the essence test; and (2) whether the Award contravenes public policy.[1]

---

[1] The District's "QUESTION PRESENTED" contains one issue: "Whether the [trial court] erred in denying the District's Petition to Vacate the [Award]." District Br. at 8. The District's "ARGUMENT" contains two issues: (1) whether the Award draws its essence from the CBA; and (2) whether the Award is contrary to law. District Br. at 13.

## Background

The District and the Association are parties to a CBA which became effective July 1, 2011.[2] Article III, Paragraph H of the CBA contains language regarding subcontracting and specifically states: "No work of the bargaining unit shall be sub[]contracted for the life of the [CBA]." Reproduced Record (R.R.) at 63a. During labor negotiations in July 2016, the District notified the Association that a Request for Proposals (RFP)[3] for custodial services had been issued on March 29, 2016. The District provided the Association with the information it received from the successful bidder. However, the District did not enter into a contract with the successful bidder.

The Association filed a grievance on April 7, 2016, claiming that the District violated the CBA *by accepting bids for custodial labor services*. The grievance was submitted to arbitration and a hearing was held before an Arbitrator on August 16, 2016. On November 7, 2016, the Arbitrator granted the Association's grievance, holding that the District had violated the CBA's "no outside subcontracting provision" and "the RFPs cannot be used in bargaining with the Association to secure [an] advantage." R.R. at 15a. The Arbitrator further held that "[o]utside contracts which eliminate the Bargaining Unit cannot be used unless or

---

[2] The CBA expired on June 30, 2016; however, the parties are maintaining the status quo by adhering to the CBA. *See Coatesville Area Sch. Dist. v. Coatesville Area Teachers' Ass'n/Pa. State Educ. Ass'n,* 978 A.2d 413, 417 (Pa. Cmwlth. 2009) ("[T]he *status quo* must be maintained between the time one contract expires and another begins[.]"). "The underlying rationale for the status quo requirement is that during the interim period between contracts, the employer may continue operations and the employee may continue working, while the parties are free to negotiate on an equal basis in **good faith**." *Pa. State Park Officers Ass'n v. Pa. Labor Relations Bd.,* 854 A.2d 674, 681 (Pa. Cmwlth. 2004) (emphasis added) (quoting *Fairview Sch. Dist. v. Unemployment Comp. Bd. of Review,* 454 A.2d 517, 521 (Pa. 1982)).

[3] The parties and the Arbitrator reference RFPs, however, according to the record, only one request was used.

2

until the parties are at legal impasse" and "[a]ny formal selection of prior RFPs are therefore considered to be null and void." R.R. at 15a.

## Facts

The District filed a Petition to Vacate Arbitration Award (Petition) on December 6, 2016. The Association filed a Motion to Strike Portions of Petition (Motion to Strike) on December 28, 2016. The trial court held a hearing on the Motion to Strike on January 23, 2017. By January 23, 2017 order, the trial court granted the Motion and struck Exhibits B, C, D and E from the Petition, leaving only Exhibits A (the CBA) and F (the Award) for consideration. On January 30, 2017, the trial court held a hearing on the Petition, and affirmed the Award and denied the Petition. The District appealed to this Court. The trial court issued an order directing the District to file a Pennsylvania Rule of Appellate Procedure (Rule) 1925(b) Concise Statement of Matters Complained of on Appeal[4] (Rule 1925(b) Statement). The District filed its Rule 1925(b) Statement on March 14, 2017. On April 13, 2017, the trial court filed its opinion.

## Discussion

The District first argues that the Award fails to draw its essence from the CBA. Initially,

> [a]s we have previously stated, grievance awards under the Public Employe Relations Act [(PERA)[5]], . . . are reviewed pursuant to the deferential essence test, which requires affirmance of an award if: '(1) **the issue as properly defined** is within the terms of the [CBA], and (2) the award can be rationally derived from the [CBA].' *Neshaminy*

---

[4] Former Rule 1925(b) read a statement of "matters" complained of on appeal. Whereas, the current Rule 1925(b) refers to a statement of "errors" complained of on appeal.

[5] Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

3

*Sch*[.] *Dist*[.] *v. Neshaminy Fed*[']*n of Teachers,* 122 A.3d 469, 474 (Pa. Cmwlth. 2015) [(*Neshaminy I*)]. Pursuant to this test, our review is 'highly circumscribed,' meaning that '[w]here it is determined that the subject matter of the dispute is encompassed within the terms of the [CBA], the validity of the arbitrator's interpretation is not a matter of concern to the court.' *Leechburg Area Sch*[.] *Dist*[.] *v. Dale,* . . . 424 A.2d 1309, 1312-13 ([Pa.] 1981).

*Cty. of Allegheny v. Allegheny Court Ass'n of Prof'l Empls.,* 138 A.3d 701, 706 (Pa. Cmwlth. 2016) (emphasis added). In the instant case, the relevant CBA provision provides:

> **No Sub[]Contracting**
>
> 1. **No work of the bargaining unit shall be sub[]contracted for the life of the Agreement.**
>
> 2. No work of the bargaining unit shall be done by a supervisor (or non-bargaining unit member). This will not prohibit supervisory personnel from performing work of an emergency nature, nor does this prohibit a supervisor from teaching cleaning procedures or demonstrating cleaning techniques to employees of the bargaining unit for training purposes.
>
> This will not prohibit a student from performing tasks as a consequence of discipline or for educational purposes, providing that no bargaining unit members experience a reduction in working hours or overtime opportunities, or are required to supervise students, as a result.

R.R. at 63a (text emphasis added). The District maintains that the RFP was issued for negotiation purposes only, the CBA makes no mention of RFPs and that the CBA was not implicated because no contract was executed. The Association rejoins that the CBA's subcontracting provisions were triggered once the RFP was issued.

The issue **before** the Arbitrator was whether "the District violate[d] the CBA by issuing [an RFP] for custodial services in the District[.] If so, what is the remedy?" R.R. at 8a. The issue the Arbitrator **addressed** was "whether the District

4

ha[d] subcontracted out work . . . ." R.R. at 10a. Clearly, the issue the Arbitrator **addressed** falls within the CBA's terms prohibiting subcontracting. However, since it is undisputed that no contract for custodial services had been signed, that issue was not before the Arbitrator.

> In determining that the issue was before him, the Arbitrator explained:
>
> '[O]utside contracting,' or 'contracting out' is a process.[6] It does not start when the contractor signs the formal contract or begins actual work. It begins when the District decides to pursue that outside contracting avenue and then advises the Association and advertises through the use of RFPs.
>
> That process, therefore, started when the current CBA was in effect and, in my opinion, is in violation of the 'no subcontracting' language. The process then continues then [sic] through the 'walk through' and culminates with the public opening of the bids and the selection of a successful bidder. The formal contract would then follow and the work would then commence.
>
> In summary, the outside contracting language becomes operative not when the outside contracting work actually begins, but at least back to when the RFPs are announced. Arguably, it could flow even back to when the District [m]anagement in their [sic] internal discussions decided to initiate the outside contracting process.

R.R. at 13a. At the time the District issued the RFP, the parties were negotiating a new contract, and the District proposed eliminating the no subcontracting provision in the next CBA (*see* Notes of Testimony August 16, 2016, Ex. E at 4), and issued the RFP to determine whether removing that provision was in the District's best interest. The Arbitrator stated that the District's action in issuing the RFP "had a 'chilling

---

[6] The Arbitrator cited no legal authority for this proposition, nor does the Association. In fact, "subcontract" is defined as "[a] secondary contract made by a party to the primary contract for carrying out the primary contract, or part of it." Black's Law Dictionary 373 (9th ed. 2009).

effect' on the negotiations[,]" and thus "was a bargaining tactic to secure advantage for the District."[7]  R.R. at 12a-13a.  The Arbitrator concluded:

> There is no question that the District, while the CBA was in effect, decided to subcontracted [sic] out and to pursue that alternative.[8]  They [sic] could have broached the subject in negotiations and pursued it without going through the RFP process.  I do not believe that [it] went through that entire process only to obtain information but to use it as a tactic in negotiations to secure advantage or to bargain to impasse.  Then potentially [it] could unilaterally initiate custodial subcontracting, thereby, eliminating the Bargaining Unit.
>
> Therefore, in my opinion, the provisions of the CBA have been violated.

R.R. at 14a.

However, the law is well-established as pronounced by the United States Supreme Court:

> **An arbitrator** is confined to interpretation and application of the [CBA]; he does not sit to dispense his own brand of industrial justice.  He may, of course, look for guidance from many sources, yet his **award is legitimate only so long as it draws its essence from the collective bargaining agreement.**

*United Steelworkers v. Enter. Wheel & Car Corp.,* 363 U.S. 593, 599 (1960); *see also State Sys. of Higher Educ. (Cheyney Univ.) v. State College Univ. Prof'l Ass'n (PSEA-NEA),* 743 A.2d 405, 411 (Pa. 1999) (emphasis added) (quoting *United Steelworkers,* 363 U.S. at 599); *Bethel Park Sch. Dist. v. Bethel Park Fed'n of Teachers,* 55 A.3d 154, 157 (Pa. Cmwlth. 2012) (emphasis added) (quoting *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7*

---

[7] As will be discussed below, the Arbitrator's pronouncement is legally incorrect, and in fact, the law is to the contrary.

[8] The Arbitrator cited no evidence to support this statement.

6

*Classroom Assistants Educ. Support Pers. Ass'n, PSEA/NEA,* 939 A.2d 855, 862-63 (Pa. 2007)).

Here, the issue before the Arbitrator was **whether the issuance of the RFP violated the CBA**. Article III, Section H of the CBA specifically states: "No work of the bargaining unit shall be sub[]contracted for the life of the Agreement." R.R. at 63a. This language is clear and unambiguous. It is completely silent on RFPs and makes no reference to RFPs or the subcontracting "process." In performing his responsibilities, the arbitrator exceeds his authority if he "ignore[s] the plain language of the contract." *United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 38 (1987). "When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award." *Cheyney Univ.,* 743 A.2d at 411 (quoting *United Steelworkers,* 363 U.S. at 599). Therefore, this Court is constrained to hold that the issue before the Arbitrator does not fall within the CBA's terms. Had the District entered into a contract with the successful bidder during the life of the CBA, clearly the issue would be within the CBA's terms, and said subcontracting would be a violation of same. Accordingly, the Award does not meet the first prong of the essence test.

Notwithstanding, even if the Arbitrator had properly determined that the issue was within the CBA's terms, the Award must be rationally derived from the CBA. *See Cty. of Allegheny.* The Award in this case provided:

> The grievance is granted. The District violated the 'no outside subcontracting' provisions of the [CBA]. The RFPs cannot be used in bargaining with the Association to secure advantage. Outside contracts which eliminate the Bargaining Unit cannot be used unless or until the Parties are at legal impasse. Therefore, at impasse, they would be subject to the applicable Pennsylvania [l]aw, Pennsylvania Labor Relation[s] Board [(PLRB)] action, and N[ational] L[abor] R[elations] B[oard] provisions. Any formal

selection of prior RFPs are therefore considered to be null and void.

R.R. at 15a. As discussed *supra,* the CBA is silent on RFPs and makes no mention of RFPs or the "subcontracting process." "**An arbitrator's award cannot be said to draw its essence from the** [**CBA**]**, where** it violates the express terms of that agreement by 'changing the language of the contract or **adding new and additional provisions**.'" *Cheyney Univ.,* 743 A.2d at 422 (emphasis added) (quoting *Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 84, AFL-CIO v. City of Beaver Falls,* 459 A.2d 863, 865 (Pa. Cmwlth. 1983)). "Moreover, where the arbitrator's words exhibit an infidelity to the agreement, courts have no choice but to refuse enforcement of the award. *Cheyney Univ.,* 743 A.2d at 422. The Arbitrator took it upon himself to fashion an Award to eliminate what he perceived to be the District's unfair advantage in negotiations which "had a 'chilling effect'".[9] R.R. at 12a. "In doing so[,] the Arbitrator went outside the CBA to make his determination. Thus, the Arbitrator's award was not rationally derived from the CBA. Accordingly, the Arbitrator's award does not meet the second prong of the essence test." *Bethel Park,* 55 A.3d at 158-59 (citation and footnote omitted).

The District next argues that the Award contravenes the well-defined and established public policy of good faith bargaining. The Pennsylvania Supreme Court adopted a public policy exception to the essence test in *Westmoreland Intermediate Unit #7 v. Westmoreland Intermediate Unit #7 Classroom Assistants Educational Support Personnel Ass'n, PSEA/NEA*, 939 A.2d 855 (Pa. 2007). The *Westmoreland* Court concluded:

> that the essence test should be subject to a narrow exception by which an arbitrator's award will be vacated if it is violative of the public policy of the Commonwealth. . . . [L]ike our adoption of the federal essence test for purposes of PERA, we conclude that the federal public policy

---

[9] See, *supra*, footnote 6.

exception is appropriately applied to arbitrator's awards arising under PERA as well. We believe that such a public policy exception constitutes a reasonable accommodation of the sometimes competing goals of dispute resolution by final and binding arbitration and protection of the public weal . . . .

More specifically, we hold that upon appropriate challenge by a party, **a court should not enforce a grievance arbitration award that contravenes public policy**. Such public policy, however, must be well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.

*Westmoreland*, 939 A.2d at 865-66 (emphasis added); *see also Phila. Housing Auth. v. Am. Fed'n of State, Cty. & Mun. Emps., Dist. Council 33,* 52 A.3d 1117 (Pa. 2012); *Neshaminy Sch. Dist. v. Neshaminy Fed'n of Teachers*, 171 A.3d 334 (Pa. Cmwlth. 2017) (*Neshaminy II*); *Slippery Rock Univ. of Pa., Pa. State Sys. of Higher Educ. v. Ass'n of Pa. State College & Univ. Faculty*, 71 A.3d 353 (Pa. Cmwlth. 2013); *Bethel Park.*

The public policy exception requires the application of a three-prong test:

First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is 'well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . . Third, **we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations or public duty**, given the particular circumstances at hand and the factual findings of the arbitrator.

*City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 414 (Pa. Cmwlth. 2011) (quoting *Westmoreland, . . .* 939 A.2d [at] 866 . . .).

9

*Neshaminy II,* 171 A.3d at 338 (emphasis added). In the instant case, the conduct leading to the grievance (first prong) was the District's issuance of an RFP for custodial services. The District maintains that it did so to fulfill its statutory duty to bargain in good faith.

The General Assembly pronounced its well-defined, dominant public policy that public employers and their employees' representatives have a mutual obligation to collectively bargain in good faith in Section 701 of PERA, which specifically mandates the parties to a CBA to "**confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement** . . . ." 43 P.S. § 1101.701 (emphasis added) (second prong). Further, Section 1201(a)(5) of PERA expressly prohibits public employers from, and makes it an unfair labor practice for, "[r]efusing to **bargain** collectively **in good faith** . . . ." 43 P.S. § 1101.1201(a)(5) (emphasis added). The import of this mandate is revealed through its similar imposition on unions as Section 1201(b)(5) of PERA equally prohibits unions from, and makes it an unfair labor practice for, "[r]efusing to **bargain** collectively **in good faith** . . . ." 43 P.S. § 1101.1201(b)(5) (emphasis added). Moreover, "[t]he duty to bargain in good faith extends to the subject of moving bargaining unit work to a private contractor." *Snyder Cty. Prison Bd. v. Pa. Labor Relations Bd.*, 912 A.2d 356, 364 (Pa. Cmwlth. 2006); *see also Morrisville Sch. Dist. v. Pa. Labor Relations Bd.,* 687 A.2d 5, 8 (Pa. Cmwlth. 1996).

With respect to the third prong, the United States Supreme Court explained:

> Good[ ]faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay an increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy.

*Nat'l Labor Relations Bd. v. Truitt Mfg. Co.,* 351 U.S. 149, 152 (1956). Further, "[a]s part of its duty to bargain in good faith, an employer must provide the union with information that is relevant and necessary to bargaining. *H & R Indus. Servs., Inc.,* 351 N.L.R.B. 1222, 1223 (2007) (citing [*Nat'l Labor Relations Bd.*] *v. Acme Indus. Co.,* 385 U.S. 432, 435–36 . . . (1967))."[10]  *Frankel ex rel. Nat'l Labor Relations Bd. v. HTH Corp.,* 693 F.3d 1051, 1064 (9th Cir. 2012).

Here, the District was negotiating to eliminate the subcontracting prohibition from the CBA.  In fulfilling its good faith bargaining duty, the District issued an RFP to determine whether it was financially feasible and thus in the District's best interest to do so.  The District presented the information it received from the successful bidder in order to provide the Association with an opportunity to match or counter the proposal.  The Arbitrator concluded "that the request [sic] for RFPs announced in the newspaper and in negotiations, had a 'chilling effect' on the negotiations."  R.R. at 12a.

However, the PLRB, the administrative agency the General Assembly expressly created and empowered to enforce and uphold its legislative mandates, *see* Section 501 of the PERA, 43 P.S. § 1101.501, has long since specifically rejected the

---

[10] Although this case involved Section 8(a) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a),

> [b]ecause [S]ections 1201(a)(1) and (a)(5) of PERA are modeled after [S]ections 8(a)(1) and (a)(5) of the NLRA, this Court may rely upon federal case law interpreting those provisions as persuasive authority. *Office of Administration v. [Pa.] Labor Relations [Bd.],* . . . 916 A.2d 541, 550 ([Pa.] 2007) ('[O]ur Court has not hesitated to consider, and to follow, federal interpretation of the NLRA due to the similarity between the federal labor law and our own laws dealing with labor relations.'); *see also [Pa.] Labor Relations [Bd.] v. Mars Area Sch[.] Dist[.],* . . . 389 A.2d 1073, 1076 ([Pa.] 1978); *accord In re Appeal of Cumberland Valley Sch[.] Dist[.],* . . . 394 A.2d 946, 950 ([Pa.] 1978).

*Erie Cty. Tech. Sch. v. Pa. Labor Relations Bd.,* 160 A.3d 151, 159 n.4 (Pa. Cmwlth. 2017).

Arbitrator's statement and reasoning upon which the Arbitrator based his conclusion that the District violated the CBA. In doing so, the PLRB opined:

> We recognize that in *Township of Little Egg Harbor*, PERC No. 76-15 2 NJPER 5 (1976), the New Jersey Public Employment Relations Commission (PERC) found that an employer had committed unfair practices in violation of Sections 5.4(a)(1) and (5) of the New Jersey Employer-Employee Relations Act[11] under circumstances similar to those of the present case. During the course of negotiations, the employer in *Little Egg Harbor* advertised for bids to subcontract garbage collections. The employer rejected all the bids received. Nevertheless, the PERC's hearing examiner found that the employer had engaged in unfair practices by failing to negotiate in good faith about the issues of subcontracting. The hearing examiner said:
>
>> A decision to advertise for bids to provide the services currently performed by the employees of the Sanitation Department during the middle of negotiations for a first contract could only have had a 'chilling effect' on the entire negotiations process. This unilateral action certainly affected changes in the 'status quo' with reference to the terms and conditions of employment of a Sanitation Department employee, specifically with regard to an individual's job security and expectation of continuing employment. The record established that a municipal sanitary collection service has been maintained for approximately the past nine years. The very act of setting in motion the process of subcontracting the unit work, in a drastic departure from the existing and past practices, is tantamount to the sending of termination notices to employees negotiating a first contract with only the precise date of termination left blank.
>
> The New Jersey PERC adopted the findings of fact and conclusions of law but not necessarily the dicta of the hearing examiner.
>
> ***Little Egg Harbor* is in conflict with our own decisions which focus on whether the public employer has**

---

[11] N.J.S. §§ 34:13A-1-13A-21.

12

> **approached the bargaining table with an open mind and a sincere desire to reach an agreement and on whether the employe organization has been afforded the opportunity to formulate its own proposal in response to subcontracting proposals received by the employer**. We have not in the past viewed the mere solicitation of bids as an inherently coercive act on the part of a public employer which would have a 'chilling effect' on negotiations. **We have, rather, regarded such solicitations as prerequisites for intelligent bargaining**. Accordingly, we reject the view of the New Jersey PERC as set forth in *Little Egg Harbor*.

*Pa. Labor Relations Bd. v. Sch. Dist. of the Twp. of Millcreek,* 9 PPER ¶ 9136 (No. PERA-C-10, 439-W, June 7, 1978) (emphasis added).

Importantly, this Court is mindful that the Board:

> possesses administrative expertise in the area of public employee labor relations and that great deference ought to be given to the PLRB's assessment of the often competing concerns relevant to the issue of whether the conduct of an employer or a union constitutes a refusal to meet the mutual obligation to bargain in good faith.
>
> *Richland Sch*[.] *Dist*[.] *v.* [*Pa.*] *Labor Relations* [*Bd.*]*, . . .* 454 A.2d 649, 652 ([Pa. Cmwlth.] 1983).

*Mars Area Ass'n of Sch. Serv. Personnel PSSPA/PSEA v. Pa. Labor Relations Bd.,* 538 A.2d 585, 597 (Pa. Cmwlth. 1987).

Based on the above, this Court holds that by granting the grievance and directing that "[t]he RFPs cannot be used in bargaining with the Association[,]" R.R. at 15a, the Arbitrator's Award violated the well-defined, dominant public policy of good faith collective bargaining and will "cause the [District] to breach its lawful obligations" to bargain in good faith. *Neshaminy II,* 171 A.3d at 338.

For all of the above reasons, the trial court's order is reversed.

_____
ANNE E. COVEY, Judge


Judge Brobson concurs in the result only.

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Millcreek Township School District,    :
                        Appellant    :
                                    :
                v.                   :
                                    :
Millcreek Township Educational    :    No. 187 C.D. 2017
Support Personnel Association    :

## O R D E R

AND NOW, this 13th day of February, 2018, the Erie County Common Pleas Court's January 30, 2017 order is reversed.

_____
ANNE E. COVEY, Judge