**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| MILLCREEK TOWNSHIP SCHOOL DISTRICT, | : | No. 37 WAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| Appellee | : | Commonwealth Court entered |
| | : | February 13, 2018 at No. 187 CD |
| | : | 2017, reversing the Order of the Court |
| v. | : | of Common Pleas of Erie County |
| | : | entered January 30, 2017 at No. |
| | : | 13252-16 |
| MILLCREEK TOWNSHIP EDUCATIONAL | : | |
| SUPPORT PERSONNEL ASSOCIATION, | : | ARGUED: April 10, 2019 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE DONOHUE**                    **DECIDED: JULY 17, 2019**

In this case, we review whether the Commonwealth Court disregarded the law when it vacated a grievance arbitration award based on its independent interpretation of the parties' collective bargaining agreement ("CBA"). Pursuant to this Court's decisions under the Public Employee Relations Act, 43 P.S. §§ 1101.101-1101.2301[1] ("PERA"), a reviewing court must apply the highly deferential two-prong "essence test" to grievance arbitration awards: first, the court must decide whether the issue is encompassed by the CBA; second, the court must uphold the arbitrator's award if the arbitrator's interpretation can rationally be derived from the CBA. *Westmoreland Intermediate Unit #7 v.*

---

[1] Act 195 of 1970, P.L. 563

*Westmoreland Intermediate Unit #7 Classroom Assistants Educ. Support Pers. Ass'n*, 939 A.2d 855, 863 (Pa. 2007) (plurality) (quoting *State Sys. of Higher Educ. (Cheyney University) v. State Coll. Univ. Prof'l. Ass'n.*, 743 A.2d 405, 413 (Pa. 1999)). As discussed in more detail herein, subject to a narrow exception for awards that violate a dominant public policy, proper application of the essence test prohibits a court from vacating an arbitrator's award unless "the award indisputably and genuinely is without foundation in, or fails to logically flow from, the [CBA]." *Id.* Because we have no trouble concluding that the award in the instant matter draws its essence from the CBA and because no public policy will be violated by its enforcement, we reverse the decision of the Commonwealth Court.

Millcreek Township Educational Support Personnel Association (the "Association") and Millcreek Township School District (the "District") are parties to a CBA that became effective on July 1, 2011, and was set to expire on June 30, 2016.[2] The bargaining unit represented by the Association consists entirely of custodians for the District's properties. As pertinent to this appeal, the CBA provides that "[n]o work of the bargaining unit shall be subcontracted for the life of the Agreement." CBA, Art. III, ¶ H (hereinafter, the "no subcontracting provision"). The CBA further provides that "the rights and privileges of the Association and its representatives as set forth in the [CBA] shall be granted only to the Association as the exclusive representative of the employees and to no other organization." *Id.*, Art. III, ¶ E (hereinafter, the "exclusivity provision").

---

[2] On June 9, 2016, the parties agreed to maintain the "status quo" following expiration of the CBA, pending the negotiation of a successor agreement. *See* Arbitration Exhibit E (June 9, 2016 Letter from Association). They subsequently agreed to extend the status quo further pending an arbitration decision. Arbitration Decision, 11/7/2016, at 3.

Negotiations for a successor CBA commenced on January 26, 2016 when the Association offered its initial proposal to the District. Approximately one month later, the District presented a counter proposal in which it sought, among other items, to eliminate the no subcontracting provision. N.T., 8/16/2019, at 24-25; Arbitration Decision, 11/7/2016, at 4. The Association rejected this proposal. N.T., 8/16/2019, at 24-25.

On March 29, 2016, with successor CBA negotiations ongoing between the Association and the District, the District issued a request for proposals ("RFP") seeking quotes from prospective bidders for the provision of custodial labor services. *See* RFP Cover Letter, 3/29/2016, at 1. Specifically, the RFP sought quotations for guaranteed pricing during a three-year contract period to begin the day after the current CBA was set to expire, namely from July 1, 2016, through June 30, 2019. *Id.* Bids were due by 11:00 a.m. on May 2, 2016, at which point they would be publicly opened. *Id.* All bids were to be submitted to the District in an envelope clearly marked "RFP CUSTODIAL SERVICES LABOR CONTRACT," and all prospective bidders were required to attend a pre-bid meeting on April 28, 2016. *Id.* Bidders were required to conduct site visits at the District's buildings. *Id.* The District advertised the RFP announcement in at least two regional newspapers.

On April 7, 2016, upon learning that the District had issued an RFP to subcontract the bargaining unit's work, the Association filed a grievance with the District.[3] Grievance, 4/7/2016. As set forth in the grievance, the Association alleged that the District "[had] violated the [CBA] by placing in several papers … a Legal Notice that the District [was]

---

[3] The CBA defines a "grievance" as "a complaint regarding the meaning, interpretation or application of any provision of this [CBA]." CBA, Art. I, Section A, at 1.

accepting bids for custodial labor services" and by announcing the pre-bid meeting scheduled for April 28, 2016. *Id.* According to the Association, "these actions directly violate[d] the [CBA], and in particular the provision that there will be no subcontracting." *Id.*[4] The Association requested that the District "cease and desist efforts to subcontract

---

[4] The Association also alleged that the District's actions violated the following additional CBA provisions:

Recognition

> The [District] hereby recognized the Association as the exclusive and sole representative for collective bargaining for all employees included in the bargaining unit as certified and determined by the Pennsylvania Labor Relations Board. A copy of said determination is attached hereto and made a part hereof, as surely as though the same were set forth herein in length.

CBA, Recognition Clause.

Statutory Savings Clause

> Nothing contained herein shall be construed to deny or restrict to any employee such rights as he/she may have under the Public School Code of 1949 as amended, or the [PERA], or other applicable laws and regulations. The rights granted to employees hereunder shall be deemed to be in addition to those provided elsewhere.

*Id.*, Art. II, Rights of the Parties, ¶ A.

Just Cause Provision

> No employee shall be disciplined, reprimanded, reduced in rank or compensation or deprived of any advantage without just cause. All information forming the basis for disciplinary action will be made available to the employees and the Association.

*Id.*, ¶ B.

Exclusive Rights

the custodial labor force" and "withdraw all present and scheduled Legal Notices." *Id.* It further requested that the District "inform any party contacting [it] with questions or actual proposals that there is no subcontracting of custodial labor services" and additionally sought "any other specific relief that the arbitrator deems appropriate." *Id.*

Following a grievance hearing on May 11, 2016, before the District's Board of Education (the "Board"), the Board issued a brief decision wherein it stated, "we do not believe that [Mr. Revell] demonstrated that [the District] violated the [CBA] by soliciting

> The rights and privileges of the Association and its representatives as set forth in this Agreement shall be granted only to the Association as the exclusive representative of the employee and to no other organizations.
>
> The officers of the Association or their designated representatives shall have the right to visit district buildings to investigate employment related problems of members of the bargain unit. Such investigations shall be conducted during the non-working hours of the investigator if said investigator is an employee of the District. The investigator shall conduct such investigation during the employee's break or lunch period.

*Id.*, Art. III, ¶ E.

> Negotiation of a Successor Agreement
>
> Deadline Date
>
> The parties agree to enter into collective bargaining over a successor agreement no later than 180 days prior to June 30, 2015. Any agreement so negotiated shall be reduced in writing after ratification by the parties.
>
> Modification
>
> This Agreement shall not be modified in whole or in part by the parties except by an instrument, in writing, duly executed by both parties.

*Id.*, Art. XII.

RFPs from outside vendors. No member of the bargaining unit lost work hours nor was any work done by an outside vendor. Request for … RFPs [sic] is not the same as outsourcing actual work." Decision of Board, 5/19/2016. The Board also explained its belief that the District "has an obligation to the tax payers to manage its budget and ensure it is paying a competitive price for the services provided." *Id.* It concluded that "the only way to determine what pricing options are available to [the District] is to ask," and opined that the District did not demonstrate bad faith in its negotiations with the Association by issuing the subcontracting RFP. *Id.*

On July 11, 2016, the District advised the Association that Facilities Management Systems ("FMS") had been selected as the successful bidder. Arbitration Decision, 11/7/2016, at 4. The District provided the Association with the bid information it received from FMS but did not in fact enter into a contract with that bidder or any other.

Pursuant to the grievance procedure set forth in the CBA, the Association appealed its grievance to arbitration, consistent with section 903 of PERA.[5] *See* CBA,

---

[5] Section 903 of PERA provides:

> Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tripartite board of arbitrators as the parties may agree. Any decisions of the arbitrator or arbitrators requiring legislation will only be effective if such legislation is enacted:
>
> (1) If the parties cannot voluntarily agree upon the selection of an arbitrator, the parties shall notify the Bureau of Mediation of their inability to do so. The Bureau of Mediation shall then submit to the parties the names of seven arbitrators. Each party shall alternately strike a name until one name remains.

Art. I, ¶ C. Following a hearing before an arbitrator selected by the parties and briefing, the arbitrator granted the Association's grievance in a written decision dated November 7, 2016. *See* Arbitration Decision, 11/7/2016, at 15. The arbitrator stated that the issue before him was whether "the District violate[d] the CBA by its issuing of a[n RFP] for custodial services in the District," and if so, what the remedy should be. *Id.* at 8. He also noted that "the primary factor to be determined" was when subcontracting begins. *Id.*

As set forth by the arbitrator, the District believed that it was acting within its managerial rights to investigate alternatives when it issued the RFP, conducted building walkthroughs and received bids. The District was also of the view that using this research in CBA negotiations with the Association, either to modify the CBA or to reach impasse and subsequently enter into a subcontract for custodial services, was both permissible under the terms of the CBA and in the best interest of taxpayers. *Id.* The arbitrator, however, did not credit the District's position because, in his view, it would have been possible to conduct due diligence and compare costs without formally requesting bids, advertising in newspapers, conducting building walkthroughs, and holding a public meeting to open bids. He characterized the District's conduct as a bad faith tactic that had a chilling effect on the negotiation process, noting that "the only step remaining in the outside contracting scheme of the District was to declare 'impasse,' sign the contract of

---

The public employer shall strike the first name. The person remaining shall be the arbitrator.

(2) The costs of arbitration shall be shared equally by the parties. Fees paid to arbitrators shall be based on a schedule established by the Bureau of Mediation.

43 P.S. § 1101.903.

the successful RFP bidder and have them commence work." *Id.* at 14. He indicated that those "final acts" would merely be the culmination of the subcontracting process which began, at the latest, on March 29, 2016, when the District issued its RFP.

The arbitrator reached this conclusion based on testimony regarding the parties' long history together. Specifically, the arbitrator made the following findings of fact:

- The parties' history includes the prior subcontracting of school bus drivers' work, which eliminated that work from the bargaining unit;

- this conduct "created raw nerves" and lasting wounds within the Association;

- the Association was aware of this history and its effect on employees;

- this history was the driving force, pursuant to testimony, behind the Association negotiating for the current and former CBA to include the no subcontracting provision.

*Id.* at 10.

Addressing the specific question of whether the District had subcontracted work in the instant situation, the arbitrator first concluded that the question was "definitely within the confines of the CBA." He then explained his interpretation of the CBA, as informed by the parties' testimony and history, that subcontracting "begins when the District decides to pursue that outside contracting avenue and then advises the Association and advertises through the use of RFPs." *Id.* Accordingly, he held that the District's actions had violated the CBA's no subcontracting provision. As relief, he ordered that "the RFPs cannot be used in bargaining with the Association to secure an advantage." *Id.* He also proscribed the use of "outside contracts which eliminate the Bargaining Unit … unless or until the parties are at a legal impasse" and directed that "any formal selection of prior RFPs are therefore considered to be null and void." *Id.*

The District filed a petition to vacate the arbitrator's award in the court of common pleas. That court affirmed the award. Applying this Court's two prong essence test, the trial court concluded that (1) "the issue of subcontracting is within the terms of the CBA" and (2) the arbitrator's interpretation of the subcontracting clause was "derived rationally from the CBA." Trial Court Order, 1/30/2017, at 1; Trial Court Opinion, 4/12/2017, at 4 (pointing to both the no subcontracting provision and the exclusivity provision). The trial court further held that the arbitration award did not pose an unacceptable risk of undermining public policy and would not cause the District to breach its lawful obligations or public duty under PERA. Trial Court Order, 1/30/2017, at 2 (applying the Commonwealth Court's three-step analysis for determining whether an arbitration award that satisfies the essence test nonetheless violates public policy, as set forth in *City of Bradford v. Teamsters Local Union No. 110*, 25 A.3d 408, 413 (Pa. Commw. 2011)).

The District appealed and the Commonwealth Court reversed. *Millcreek Twp. Sch. Dist. v. Millcreek Twn. Educ. Support Pers. Ass'n*, 179 A.3d 1167 (Pa. Commw. 2018). It explained that the issue before the arbitrator was whether the issuance of the RFP violated the CBA, not whether the District had subcontracted out work. *Id.* at 1172. It then found that because the plain language of the CBA provided that "[n]o work of the bargaining unit shall be subcontracted for the life of the Agreement," and because the CBA is "completely silent" as to RFPs or any other part of the "process" of subcontracting, it was constrained to hold that the issue before the arbitrator did not fall within the terms of the CBA. *Id.* Based on this same analysis, the Commonwealth Court further concluded that the arbitrator's award was not rationally derived from the CBA and therefore failed the essence test. *Id.* at 1173.

Finally, the Commonwealth Court held that even assuming arguendo that the arbitrator's award passed the essence test, it must nonetheless be vacated pursuant to that test's public policy exception. *Id.* at 1173-74. Tracking it's *City of Bradford's* three-step analysis, the Commonwealth Court concluded that (1) the conduct leading to the grievance was the District's issuance of an RFP for custodial services; (2) the conduct implicates a "well-defined, dominant" public policy because section 701 of PERA mandates parties to "confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement …"; and (3) the arbitrator's award poses an unacceptable risk of undermining the implicated public policy because directing that the RFPs cannot be used in bargaining with the Association contravenes the notion that "such solicitations [are] prerequisites for intelligent bargaining," rather than "inherently coercive." *Id.* at 1176 (quoting *PLRB v. Sch. Dist. of the Twp. of Millcreek*, 9 PPER ¶ 9136 (No. PERA-C-10, 439-W, June 7, 1978)).

The Association appealed and we granted allocatur to review:

> (1) Whether the Commonwealth Court panel grossly departed from this Court's accepted practices regarding review of labor arbitration awards and abused its discretion when it failed to give proper deference to the arbitrator's factual findings and contractual interpretation.
>
> (2) Whether the Commonwealth Court panel's decision conflicts with numerous decisions of both this Court and the Commonwealth Court applying the deferential essence test and defining the authority of the arbitrator.
>
> (3) Whether the panel erroneously held that the award violated public policy despite the fact that it specifically acknowledges and accounts for the District's legal duty under [PERA].

*Millcreek Twn. Sch. Dist. v. Millcreek Twn. Educ. Support Pers. Ass'n*, 195 A.3d 562 (per curiam).

We begin by addressing the first two issues on review, the resolution of which requires us to probe how much deference is expected of a reviewing court pursuant to the essence test. In particular, we must decide the extent to which the essence test requires deference to an arbitrator's interpretation of a contractual provision. As an initial matter, we observe that while the parties do not dispute that the essence test (including its public policy exception) is the governing standard of judicial review, they disagree as to whether the Commonwealth Court properly applied it here.

The Association argues that the Commonwealth Court failed to give proper deference to the arbitrator's interpretation in applying the essence test and erroneously engaged in a merits review of the award, re-evaluating the evidence and substituting its own judgment. Association's Brief at 19-20. Specifically, the Association argues that an arbitrator is authorized to make findings of fact and to interpret undefined terms in the CBA. The Association posits that a reviewing court is not authorized to undertake an independent factual analysis because an arbitrator's factual findings are unreviewable so long as the arbitrator was "even arguably construing or applying the contract." *Id*.

Regarding contract interpretation, the Association urges that an arbitrator is entitled to rely on the CBA's "language, its context, and any other indicia of the parties' intention" and, importantly, that an arbitrator's interpretation of the parties' intent is not cognizable on appeal because it too is considered a finding of fact. *Id.* (citing *Cmty. Coll. of Beaver Cnty v. Cmnty. Coll. of Beaver Cnty., Soc'y of Faculty (PSEA/NEA)*, 375 A.2d 1267, 1275 (Pa. 1977)) ("*Beaver County*"). In the Association's view, because the

arbitrator here considered the no subcontracting provision together with other provisions of the CBA as well as the parties' previous subcontracting dispute and the inherently destructive effect of the District's actions, his conclusion that the parties intended the no subcontracting provision to prohibit the entire process of subcontracting drew its essence from the CBA. *Id.* at 22.

The District urges that because the CBA makes no mention of the issuance of RFPs, and because the term "no subcontracting" unambiguously prohibits "nothing other than the act of removing work from the bargaining unit via entering into a contract with a third party, which the parties agree[] has not happened," the issue is not within the terms of the CBA. District's Brief at 14.[6] In the District's view, the arbitrator impermissibly ignored the plain and unambiguous language of the CBA, adding new provisions that appear nowhere in the contract. *Id.* at 13-14. For this reason, according to the District, the Commonwealth Court did not err in vacating the award, which derived not from the CBA itself but from these manufactured provisions. *Id.*[7]

---

[6] The District also appears to argue that because the precise issue before the arbitrator contained the term "RFP" but did not contain the term "subcontracting," the issue was not "within the terms" of the no subcontracting provision. This view merely begs the question actually answered by the arbitrator, namely whether the no subcontracting provision encompasses a bar on issuing RFPs. Moreover, requiring that in order for an issue to be "within the terms" of the CBA, the precise issue statement presented to the arbitrator must include the exact same language as the CBA provision alleged to have been violated, arguably elevates form over function.

[7] The Pennsylvania School Boards Association ("PSBA"), together with the Pennsylvania State Association of Township Supervisors, the Pennsylvania State Association of Township Commissioners, and the Pennsylvania Municipal League, filed an amici curiae brief in support of the District which we refer to, hereinafter, as PSBA's Amicus Brief. The Pennsylvania State Education Association ("PSEA") filed an amicus brief in support of the Association which we refer to, hereinafter, as PSEA's Amicus Brief.

Although this Court's articulation of the essence test has evolved over time, we first formally adopted the deferential standard of review more than forty years ago in *Beaver County*. There, we explained that the standard of review applicable to grievance arbitration awards was consistent with the standard of review under federal labor law. *Beaver County*, 375 A.2d at 1272. In that regard, we discussed with approval the "Steelworkers Trilogy," explaining that the United States Supreme Court had established therein "that arbitration under the collective bargaining agreement is the preferred manner of resolving labor disputes and that the less judicial participation, the better." *Id.* at 1272 n.6.[8]

Accordingly, we adopted the policy as articulated in *United Steelworks v. Enterprise Wheel and Car Corp.*, 363 U.S. 593, 596 (1960):

> The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards.
>
> An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may, of course, look for guidance from many sources, yet **his award is legitimate only so long as it draws its essence from the collective bargaining agreement**. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award.

*Beaver County*, 375 A.2d at 1272.

---

[8] The trilogy of cases includes *United Steelworkers v. Am. Mfg. Co.,* 363 U.S. 564 (1960), *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574 (1960), and *United Steelworkers v. Enterprise Wheel and Car Corp.,* 363 U.S. 593 (1960).

Of particular relevance to the case at bar, this Court in *Beaver County* explained that because the task of interpreting a CBA involves determining the intention of the contracting parties, as evidenced by their agreement and the circumstances surrounding its execution, "the arbitrator's award is based on a resolution of a question of fact and is to be respected by the judiciary if 'the interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention.'" *Id.* at 1275 (citing *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1128 (3d Cir. 1969)).

Twenty-two years later, we recounted the seemingly explicit philosophy of judicial restraint embodied in *Beaver County*, but acknowledged that "what exactly the essence test means, and the concomitant extent of judicial review, has proved a nettlesome question." *State Sys. of Higher Educ. (Cheyney Univ.) v. State Coll. Univ. Prof'l. Ass'n.*, 743 A.2d 405, 412 (Pa. 1999) ("*Cheyney*") (discussing cases that have employed "differing verbiage" signifying "various degrees of judicial deference"). In an effort to provide clarity, we announced in *Cheyney* that the essence test entails two prongs: "First, the court shall determine if the issue as properly defined is within the terms of the [CBA]. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the [CBA]." *Id.* at 413.

Emphasizing the import and impact of the essence test, we observed that a reviewing court "must accord great deference" to an arbitration award. *Cheyney*, 743 A.2d at 413. We concluded in *Cheyney* that "in the vast majority of cases, the decision of the arbitrator shall be final and binding upon the parties." *Id.* We framed the essence

test as a narrow exception to this finality doctrine – the arbitration award must be affirmed unless it "indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement." *Id.*

Since *Cheyney*, this Court has discussed and/or applied the essence test several times, uniformly finding that the Commonwealth Court erred in determining that an arbitration award failed to draw its essence from the CBA. *See, e.g., Danville Area Sch. Dist. v. Danville Area Educ. Ass'n, PSEA/NEA*, 754 A.2d 1255, 1261 (Pa. 2000) (observing that application of the essence test limits a reviewing court to merely verifying that the "arbitrator applied the terms of the agreement and discerned the intent of the parties viewed in light of the language, its context and other indicia of the parties' intent"); *Office of Attorney General v. Council 13, American Fed'n of State, Cnty. Mun. Emps.,* 844 A.2d 1217, 1222 (Pa. 2004) (emphasizing that the General Assembly expressly provided in section 903 of PERA that the decision of the arbitrator "must be final and binding"); *Westmoreland*, 939 A.2d at 863 (emphasizing that the essence test requires more deference than would a "manifestly unreasonable" standard of review and remanding for consideration of narrow public policy exception); *Phila. Hous. Auth. v. Am. Fed'n of State, Cnty. and Mun. Emps., Dist. Council 33, Local 934*, 52 A.3d 1117 (Pa. 2012) (finding that there was no dispute that the arbitration award flowed logically from the CBA but vacating award as violative of public policy).

We now turn to application of the essence test. The first prong of the essence test requires the reviewing court to determine whether the issue decided was properly before the arbitrator. *See Cheyney*, 743 A.2d at 413 (noting that a reviewing court only moves on to the second prong of the test "if the issue is embraced by the agreement, and thus,

appropriately before the arbitrator"); *see also Pa. Tpk. Com'n v. Teamsters Local Union No. 77*, 45 A.3d 1159, 1163 (Pa. Commw. 2012) (citing *Cheyney* and characterizing consideration of whether the issue is embraced by the CBA as a question of the arbitrator's jurisdiction to address the issue). The Commonwealth Court here attempted to distinguish between the issue that was actually **before** the arbitrator and the issue the arbitrator **addressed**. According to that court, whether the District violated the CBA by issuing an RFP was the issue before the arbitrator and that issue was not encompassed by the terms of the CBA. On the other hand, the issue the arbitrator addressed was whether the District had subcontracted work, which the Commonwealth Court characterized as "clearly … within the CBAs terms prohibiting subcontracting." *Millcreek,* 179 A.3d 1171. Because these two issues are inextricably intertwined, we view the distinction between them as immaterial.

More to the point, the Association expressly framed the issue in its grievance by reference to the terms of the CBA. *See* Grievance Procedure, 4/7/2016 (setting forth the Association's allegations that the District "violate[d] the [CBA], and in particular the provision that there will be no subcontracting" by, inter alia, "accepting bids for custodial labor services"). Thus, the issue that was actually before the arbitrator was itself plainly encompassed by the CBA. We decline to allow the District to reframe the grievance in an attempt to persuade us that the issue was not properly before the arbitrator. We observe that analysis pursuant to the first prong of the essence test should not consist of a word-for-word comparison between the language of the issue and the language of the CBA. The fact that the CBA makes no reference to an "RFP" is far from outcome determinative.

Because we acknowledge that the quasi-jurisdictional nature of the first prong might suggest to reviewing courts that their de novo review is appropriate, we observe that, in the case at bar, the question of whether the issue is embraced by the terms of the CBA cannot be answered without first deciding the meaning of the relevant terms. As earlier discussed, interpretation of contractual terms is a task for the grievance arbitrator and is entitled to a high degree of deference. *See supra*, pp. 13-16. Therefore, we hold that the reviewing court must give deference to the arbitrator's interpretation of the CBA including for purposes of the first prong of the essence test. *Cf. Town of McCandless v. McCandless Police Officers Ass'n*, 901 A.2d 991, 995 (Pa. 2006).[9]

Our conclusion that a reviewing court must defer to the arbitrator's interpretation of the terms of the CBA for purposes of the first prong of the essence test is consistent with the highly deferential spirit of that test. It is also consistent with this Court's decision in *Midland Borough School Dist. v. Midland Educ. Ass'n, PSEA*, 616 A.2d 633 (Pa. 1992). In that case, during the term of a two-year CBA with the Midland Education Association ("MEA"), Midland School District ("MSD") entered into an agreement with Beaver School District ("BSD") to send MSD's seventh through twelfth grade students to Beaver on a "tuition basis." *Id.* at 634. This agreement had the effect of eliminating all teaching

---

[9] *Town of McCandless* arose in the analogous arena of an Act 111 arbitration. Pursuant to Act 111, grievance arbitration appeals are subject only to a "narrow certiorari" scope of review, which allows the reviewing court to inquire into four limited areas: the arbitrator's jurisdiction, the regularity of the proceedings, questions of excess in exercise of powers, and constitutional questions. While we explained in *Town of McCandless* that "generally speaking, a plenary standard of review should govern the preliminary determination of whether the issue involved implicates one of the four areas of inquiry … thus allowing for non-deferential review," we further observed that extreme deference to the arbitrator is required where the preliminary determinations themselves turn "upon arbitral fact-finding or a construction of the relevant CBA." *Town of McCandless*, 901 A.2d at 1000.

positions for those grades in MSD. The MEA was the bargaining representative for all professional employees in MSD, including the teachers whose positions were eliminated. Accordingly, the MEA filed a grievance alleging that the MSD's agreement to "tuition out" the students amounted to "subcontracting out of bargaining unit work," and therefore violated the parties' CBA. *Id.* Notably, the CBA in *Midland* did not contain a no subcontracting provision or any other provision that explicitly addressed the issue of subcontracting. *Id.*

Following a hearing before an arbitrator selected by the parties, the arbitrator ordered MSD to rescind its contract with BSD, to bargain in good faith with the MEA, and to make the affected teachers whole. When the case reached this Court, the question before us was whether the arbitrator properly exercised his authority in concluding that "subcontracting out" students constituted the "allocation of bargaining unit work," despite the CBA's silence on subcontracting. *Id.* We also characterized the question presented as "whether an arbitrator may resolve an issue not expressly covered by the collective bargaining agreement." *Id.* at 635. Discussing and applying the essence test, we concluded that the arbitrator had the authority to resolve the "subcontracting" issue even though the CBA did not speak directly to the "tuitioning" or "subcontracting" of students. Specifically, we reasoned that because the CBA contained provisions relating to "Hours of Work and Other Conditions of Employment" and "Job Security and Job Progression," the issue of subcontracting out students, which inevitably led to the elimination of teaching positions, was implicitly encompassed by the terms of the CBA. *Id.*[10]

---

[10] *Midland* was decided prior to our articulation of the two-prong essence test in *Cheyney*. However, nothing in *Cheyney* undercuts our reasoning in *Midland*, which nonetheless

Similarly, in the case at bar, the arbitrator interpreted the no subcontracting provision to encompass the issue before it despite the fact that the CBA did not expressly prohibit the precise act of issuing an RFP. The arbitrator pointed to the no subcontracting provision and reasoned, based on the chilling effect of the District's conduct and the parties' contentious subcontracting history, that the parties intended that provision to disallow the formal **process** of subcontracting, including the issuance of an RFP, not merely the final act of entering into a subcontract.

Based on the foregoing, it was within the purview of the arbitrator to find that issuing an RFP, an act the District concedes is a necessary step in the process of subcontracting the work of the bargaining unit, is within the terms of a CBA that expressly prohibits subcontracting. Arbitration Decision, 11/7/2016, at 10; *see also Danville,* 754 A.2d at 1257-58 (holding that the issue of teacher's entitlement to certain retirement benefits was within the terms of a CBA provision conditioning benefits upon at least thirty "years of service in public education" even though teacher had worked in the school district for less than thirty years); *Juniata-Mifflin Cnties. Area Vocational-Tech. Sch. v. Corbin*, 691 A.2d 924 (Pa. 1997) (affirming arbitrator's definition of his own ability to address issue where the parties' intention to incorporate job security provisions of the Public School Code into the CBA was not clearly set forth therein but "the language

---

explored the contours of what would become the test's first prong, namely whether the issue was properly before the arbitrator.

Ultimately, in *Midland*, we vacated the arbitration award to the extent it ordered the parties to comply even after the existing CBA expired, concluding that the arbitrator was without jurisdiction to make an award that extended "well beyond the temporal parameters by which the parties … agreed to be bound." *Id.* at 638.

employed was sufficient for the arbitrator to conclude" that those provisions were incorporated). The Commonwealth Court erred in rejecting the arbitrator's interpretation of the CBA for purposes of the first prong of the essence test. In doing so, that court impermissibly converted what is supposed to be a highly deferential standard of review into a de novo review courts typically employ when deciding matters of law.[11]

We thus turn to the second prong of the essence test. Under the second prong, we ask whether the award itself can rationally be derived from the CBA. Here, again, we emphasize that the parties to a CBA have agreed to allow the arbitrator to give meaning to their agreement and fashion appropriate remedies for "unforeseeable contingencies." *See Warrior & Gulf*, 363 U.S. at 578-79 (observing that a CBA "is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate"). The words of the CBA are not "the exclusive source of rights and duties." *Id.*; *see Enterprise Wheel*, 363 U.S. at 597-99. The arbitrator is authorized to make

---

[11] The Association urges that the Commonwealth Court improperly ignored the exclusivity provision, *see supra*, note 4, in determining that the issue addressed was not encompassed by the terms of the CBA. Specifically, the Association states that the exclusivity provision gives it the "exclusive right and privilege to discuss the terms and conditions of employment of the District's custodial employees." Association's Brief at 25. Because an exclusivity provision is breached whenever a party "knowingly engages in activity which effectively fosters and instigates competition," the Association argues that the District violated the provision by issuing an RFP that invites other organizations to set the terms and conditions of the District's custodial employees. *Id.* (citing *Aiken Indus., Inc. v. Estate of Wilson*, 383 A.2d 808, 811 (Pa. 1978)).

Had the arbitrator relied on the exclusivity provision and interpreted it in this way in his decision and award, we would be inclined to pay deference to his interpretation. However, beyond listing the exclusivity provision along with various other provisions of the CBA that the Association cited in its grievance, the arbitrator did not reference the exclusivity provision in his analysis. While the arbitrator's failure to rely on this provision does not necessarily preclude us from finding that the issue before the arbitrator was encompassed by that provision, we find it unnecessary to do so in light of our determination that the issue was within the terms of the CBA by virtue of the no subcontracting provision.

findings of fact to inform his interpretation of the CBA. *United Paperworkers Internat'l Union, AFL-CIO v. Misco, Inc.,* 484 U.S. 29, 38 (1987) ("*Misco*").

Accordingly, even though an arbitrator is not permitted to ignore the CBA's plain language in fashioning an award, the arbitrator's understanding of the plain language must prevail. A reviewing court "should not reject an award on the ground that the arbitrator misread the contract." *Misco,* 484 U.S. at 38. The law is clear that an arbitrator's award must draw its essence from the CBA. It need not, contrary to the District's position, reflect the narrowest possible reading of the CBA's plain language. *Cheyney*, 743 A.2d at 411 (citing *Enterprise Wheel*, 363 U.S. at 597); *see also Danville*, 754 A.2d at 1260 (observing that an arbitrator "is not confined to the express terms" of the CBA in discerning the parties' intent). Even if a court's interpretation of the CBA is entirely different than the arbitrator's, the award must be upheld so long as it rationally derives from the CBA. *Westmoreland*, 939 A.2d at 863 (holding that the essence test clearly does not permit the reviewing court "to intrude into the domain of the arbitrator and determine whether an award is 'manifestly unreasonable'").

Here, the arbitrator's interpretation and resulting award reflect a reading of the CBA that was informed by his understanding of the parties' history and the context. Specifically, the arbitrator found that because of the parties' contentious subcontracting history, the no subcontracting provision should be read to protect contract negotiations from the chilling effect occasioned by even the prospect of subcontracting. In this regard, the arbitrator rejected testimony from the District that it issued an RFP merely to discover whether eliminating the no subcontracting provision might be beneficial to taxpayers and in furtherance of its obligation to bargain in good faith. Instead, the arbitrator found that

the District issued the RFP "as a tactic in negotiations to secure advantage or to bargain to impasse." Arbitration Decision, 11/7/2016, at 14. Based on these considerations, which he was entitled to entertain, the arbitrator concluded that the parties intended to prohibit the process of subcontracting including, in particular, the formal steps the District took toward entering a subcontract. This interpretation rationally derives from the CBA.

By way of relief, the arbitrator granted the Association's grievance, directed the District not to use the bids it received to secure an advantage in negotiations with the Association, and ordered that outside contracts could not be considered unless and until the parties reached impasse. The arbitrator also declared the prior selection of a successful bidder "null and void." *Id.* at 15. This award is aimed directly at remedying the District's violation of the no subcontracting provision, as rationally interpreted by the arbitrator to prohibit the process of subcontracting. Therefore, we conclude that it logically flows from the CBA. The second prong of the essence test is satisfied.

We are particularly persuaded by the arbitrator's observation that the steps the District took toward subcontracting the custodial work (e.g., issuing an RFP, advertising in newspapers, meeting with bidders, conducting walkthroughs and selecting a successful bidder at an open meeting) are the typical prerequisites to subcontracting. Because these steps are required in circumstances where subcontracting **is** permissible, we conclude that it was not irrational for the arbitrator to decide that they are impermissible under circumstances where, as here, subcontracting is contractually prohibited.

Stated differently, the District concedes that the work of the bargaining unit cannot be subcontracted absent the issuance of an RFP and that the CBA prohibits subcontracting the work of the bargaining unit. Because it would be eminently reasonable

for the Association to view the issuance of an RFP as the formal initiation of subcontracting, it was similarly rational for the arbitrator to interpret the no subcontracting provision as barring these preliminary steps. The arbitrator soundly exercised his duty to interpret the CBA when he concluded that the no subcontracting provision barred not just the act of subcontracting but those activities directly and necessarily incident to it. *Cf. Hughes v. Seven Springs Farm, Inc.*, 762 A.2d 339, 344 (Pa. 2000). The Commonwealth Court disregarded the law in substituting its own narrower view of the CBA's language.

This Court addressed a similar interpretative question in *Hughes*, albeit in a context that actually called for our de novo review (of a statute), rather than our highly deferential review of a CBA. *Id.* There, the question was whether the Skier's Responsibility Act, which made the doctrine of assumption of the risk applicable to skiers engaged in the sport of downhill skiing, applied to a skier who "was not in the process of skiing downhill, but rather was propelling herself toward the ski lift at the base of the mountain following a downhill run," when she was injured. *Id.* We declined to interpret the Skier's Responsibility Act or the sport of downhill skiing "in an extremely narrow, hypertechnical and unrealistic manner." *Id.* Instead, we observed that "the sport of downhill skiing encompasses more than merely skiing down a hill. It includes those other activities directly and necessarily incident to the act of downhill skiing." *Id.* While the statute we reviewed in *Hughes* unmistakably referred to "downhill skiing," we recognized there, as we do here in the case of a CBA that references "subcontracting," that ostensibly precise language may reveal itself to have broader meaning when considered in light of specific factual circumstances.

As we have indicated in the past, one reason such a high degree of deference is appropriate in the context of CBAs is that "if an arbitrator's interpretation is contrary to one party's understanding of the agreement … the agreement can be renegotiated to reflect the 'true' intention of the party" the next time the parties negotiate their CBA. *Danville*, 754 A.2d at 1262 (emphasizing the "give and take" of the bargaining process). Here, if it chooses to, the District may bargain to erase the arbitrator's interpretation of the no subcontracting provision in any successor CBA with the Association. *Id.*

Having determined that the arbitration award satisfies the essence test, we must now analyze whether the award survives the public policy exception to the test which we formally recognized for the first time in *Westmoreland*. In that case, the arbitration award reinstated a classroom assistant who had been discharged after overdosing from the use of a Fentanyl patch in the school bathroom. The Commonwealth Court vacated the arbitration award, holding that it did not rationally derive from the CBA and noting further that the award violated the employer's ability to discharge its "core function" of educating children. On appeal, we held that the award satisfied the essence test because the arbitrator determined that the employee's conduct was merely "foolish" and not "immoral," which meant that there were insufficient grounds to substantiate a termination for "just cause," as required by the CBA. *Westmoreland*, 939 A.2d at 866. Accordingly, the award of reinstatement rationally derived from that agreement. *Id.*

However, citing the "federal public policy exception" as well as Pennsylvania contract law principles, we indicated that a reviewing court could nonetheless vacate an arbitrator's award that satisfies the essence test if (and only if) it violates a "well-defined, dominant" public policy as provided "by reference to the laws and legal precedents and

not from general considerations of supposed public interests." *Id.* at 864-66 (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers*, 461 U.S. 757, 766 (1983)).[12]  Specifically, we noted that "if the contract as interpreted by the arbitrator violates some explicit public policy, then the award cannot be enforced." *Id.* at 864. Finally, we placed the burden of establishing a public policy violation on the party asserting it, and emphasized that "the violation of such a policy must be clearly shown." *Id.* at 865.  Although our Opinion in *Westmoreland* garnered only a plurality, now-Chief Justice Saylor, in a concurring opinion, joined the plurality in adopting the narrow public policy exception.  *See id.* at 868 (Saylor, C.J., concurring) (emphasizing his understanding that "the exception is exceptionally narrow").

Subsequently, in *Philadelphia Housing*, we granted allocatur to address the proper application of the public policy exception. *Phila. Hous.*, 52 A.3d at 1128.  Like *Westmoreland*, the case involved arbitration to resolve a grievance related to an employee's discharge where the governing CBA contained a "just cause" provision.  The issue was whether the Philadelphia Housing Authority had "just cause" to terminate the employee following an internal investigation into accusations that he had sexually harassed a coworker.  Despite finding that the employee had engaged in "lewd, lascivious and extraordinarily perverse" behavior constituting "unacceptable" sexual harassment, the arbitrator nonetheless ordered that the employee be reinstated with back pay.

---

[12]  In *Westmoreland*, we rejected the previously applicable "core functions" exception to the essence test relied upon by the Commonwealth Court in that case, finding that it ran the risk of "swallow[ing] the essence test by its sheer breadth." *Westmoreland*, 939 A.2d at 865. Under the "core functions" exception, a reviewing court could vacate an arbitration award if the award impacted a "core function" of a public employer "and would deprive the employer of its ability to discharge that function." *Id.* at 860.

This Court unanimously agreed that the arbitration award violated a dominant public policy against sexual harassment. The Majority stated that the "egregious" nature of the employee's conduct could not be squared with an award reinstating him because doing so "makes a mockery of the dominant policy against sexual harassment." *Id.* at 1128. However, despite the Majority's recognition that the "crux of this matter lies in the proper application of the public policy exception," the Majority did not articulate a clear test for applying the public policy exception, noting only that there should be "some reasonable, calibrated, defensible relationship between the conduct violating dominant public policy and the arbitrator's response." *Id.* at 1121, 1128; *see id.* at 1135-36 (McCaffery, J., concurring, joined by Baer, J.) (observing that the Majority fails "to articulate any scope or standard of review for when a PERA arbitration award purportedly violates public policy").

Notably, *Philadelphia Housing* did not include any discussion of the Commonwealth Court's *City of Bradford* test.[13] In *City of Bradford*, apparently seeking a concrete framework for applying *Westmoreland*'s public policy exception, the Commonwealth Court announced a three step analysis. *See City of Bradford*, 25 A.3d at 414. Under the Commonwealth Court's analysis, a reviewing court should examine:

> First, the nature of the conduct leading to the discipline must be identified. Second, we must determine if that conduct implicates a public policy which is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Westmoreland I,* 595 Pa. at 666, 939 A.2d at 866. Third, we must determine if the arbitrator's award poses an unacceptable risk that it will undermine the implicated policy and cause the public employer to breach its lawful obligations

---

[13] *Philadelphia Housing* was submitted to this Court on November 22, 2011. The Commonwealth Court decided *City of Bradford* on June 23, 2011.

> or public duty, given the particular circumstances at hand and the factual findings of the arbitrator.

*Id.*[14] This is the test the Commonwealth Court in the case at bar drew upon to reach the conclusion that the arbitrator's award could not be enforced.

The Association urges us not to apply the analysis from *City of Bradford*, arguing that it is not faithful to *Westmoreland*. According to the Association, *Westmoreland* requires the reviewing court to focus solely on whether the **remedy** imposed by the arbitrator implicates a dominant public policy, not on whether the **conduct** giving rise to the remedy itself violates public policy. Because the first two steps of the *City of Bradford* analysis inquire into the conduct, the Association posits that the analysis allows for a review of the merits of the arbitrator's decision, which conflicts with the essence test and with the limited nature of the public policy exception. The Association also views the *City of Bradford* analysis as ill-fitted to issues outside the employee discipline context in which it was developed. Finally, the Association argues that, contrary to *City of Bradford*'s third prong, *Westmoreland* requires more than a "mere risk of undermining" a public policy. Association's Brief at 39.

---

[14] As in *Westmoreland* and *Philadelphia Housing*, *City of Bradford* involved a grievance related to an employer's termination of an employee for "just cause" pursuant to the terms of the governing CBA. *Id.* In that case, the employee was a refuse collector who had stolen money from a purse he found in a garbage can. The arbitrator reduced his discipline from termination to suspension without pay. On review, the Commonwealth Court applied its test and affirmed the award, concluding that (1) the nature of the conduct leading to discipline was theft; (2) on-the-job theft by a public employee implicates a well-defined public policy because theft is a crime and because theft undermines PERA's policy to protect the safety and welfare of the public; and (3) the award did not pose a significant risk that the public policy against theft would be undermined in light of mitigating factors, including the fact that the employee had a good work history, made restitution, and his conduct was isolated, unplanned and unlikely to be repeated. *Id.*

The Association instead proposes that, pursuant to *Westmoreland*, a reviewing court should first identify precisely what remedy the arbitrator ordered and then inquire whether that remedy compels the employer to violate a well-defined and dominant public policy expressed in positive law. *Id*. at 40. Because this analysis follows a reviewing court's conclusion that the award is valid under the essence test, the Association cautions that a court must base its determination about the public policy exception on the arbitrator's interpretation of the CBA. *Id*. Applying its proposed analysis to the remedy ordered by the arbitrator in the instant matter, the Association observes that the arbitrator crafted "traditional make-whole relief for a contract violation" which, notably, does not permanently prevent the District from issuing an RFP and therefore does not violate the District's good faith bargaining obligations or any dominant public policy. *Id*. at 41-42. To the contrary, the Association posits that the arbitrator's award **promotes** good-faith bargaining by recognizing that the District was "not contractually privileged to pursue subcontracting" under the terms of the CBA. *Id.* at 47.

Without expressly advocating for or against any specific analytic framework for implementing the public policy exception, the District impliedly concedes that the focus of the exception is on the remedy. It generally argues that the arbitrator's award violates public policy and must be vacated, even if we conclude that it satisfies the essence test. District's Brief at 16. Specifically, the District asserts that it cannot comply with the arbitrator's award without violating its duty to bargain in good faith and consequently, committing an unfair labor practice. In this regard, the District reasons that because the Public Labor Relations Board ("PLRB") has held that PERA's good faith bargaining obligation requires an employer seeking to propose subcontracting to solicit bids **and** to

apprise the union about the bids during negotiations, failure to do so violates a dominant policy as defined by reference to PERA. *Id.* at 16-18 (citing PLRB decisions). In one case cited by the District, the PLRB determined that a school district had violated its duty to bargain in good faith where it failed to provide the union with an opportunity to review subcontracting bids and make counterproposals prior to subcontracting the work of the union. *Id.* at 20 (discussing *Council Rock Sch. Dist.*, 20 PPER ¶ 20066 (PLRB 1989)). The District does not contend, and our research does not indicate, that any of the decisions relied upon by the District involved a no subcontracting provision.

The District and its amici also urge that the arbitration award violates the public policy set forth in section 528 of the Public School Code, 24 P.S. § 5-528.[15] Specifically, they argue that section 528 "requires Pennsylvania school districts … who wish to contract out 'non-instructional services' with third party contractors to solicit bids from said contractors … **in advance** of approving any contract." PSBA's Amicus Brief at 22; District's Brief at 22-23.

As evidenced by the foregoing discussion of *Westmoreland*, *Philadelphia Housing* and *City of Bradford*, application of the public policy exception has developed primarily in the context of employee discipline grievances, which bear little similarity to the present matter. Accordingly, without opining on the suitability of the test in the employee discipline grievance context, we agree with the Association that *City of Bradford* is ill-suited to the grievance presented here. Its application risks inviting reviewing courts to take a broader view of the public policy exception than our cases permit. We also agree that the inquiry into whether an arbitration award violates a dominant public policy requires an inquiry into

---

[15] Act of June 22, 2018, P.L. 241, No. 39, § 2, effective July 1, 2018.

the award itself, i.e. the remedy. That said, although there may be some awards that violate public policy regardless of the context in which they are applied, other remedies may violate public policy only as applied to the circumstances. Accordingly, the circumstances giving rise to the grievance and subsequent award are not entirely irrelevant to the analysis.

Before articulating the applicable analysis, we note that not only is the public policy exception "exceptionally narrow" in its own right, *Phila. Hous.*, 52 A.3d at 1125 (quoting *Westmoreland*, 939 A.2d at 868 (Saylor, C.J., concurring)), but it is also an exception to the essence test, which is itself a narrow exception to the doctrine that arbitration awards are final and binding. *See Cheyney*, 743 A.2d at 413. A baseline recognition that the public policy exception is a narrow exception to a narrow exception must guide a reviewing court's analysis.

Guided by this standard of review and our precedent identifying the public policy exception, we advance a three part test. First, a reviewing court must identify precisely what **remedy** the arbitrator imposed. *Westmoreland,* 939 A.2d at 865-66 (urging that "a court should not enforce a grievance arbitration **award** that contravenes public policy"). Next, the court must inquire into whether that remedy implicates a public policy that is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." *Id.* at 866. Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator. We emphasize that the arbitrator's interpretation of the contract controls during this entire analysis, which is only triggered upon the reviewing court's determination that

the award satisfies the essence test, and should be upheld absent a clear violation of public policy. *Id.* at 864. The burden is on the party that opposes the award to demonstrate that it violates public policy. *Id.* at 865.

We now apply this test to the award sub judice. Here, upon finding that the District violated the no subcontracting provision, the arbitrator issued a remedy that: prohibited the use of RFPs in bargaining with the Association; ordered the District not to use outside contracts "unless or until the parties are at legal impasse"; directed that upon legal impasse, any use of outside contracts "would be subject to the applicable Pennsylvania Law, [PLRB] action, and NLRB provisions"; and declared the "formal selection of prior RFPs" to be "null and void." Arbitration Decision, 11/7/2016, at 15. As discussed, the District urges that this award implicates the dominant public policy requiring it to bargain in good faith around the decision to subcontract work. The District further posits that enforcement of the award will compel it to violate this public policy by preventing it from soliciting and sharing bid information with the Association in anticipation of subcontracting out the custodial work.

As an initial matter, we recognize that section 701 of PERA requires parties to a CBA to "confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement . . . ." 43 P.S. § 1101.701. Moreover, pursuant to section 1201 of PERA, "refusing to bargain collectively in good faith" over mandatory subjects for bargaining constitutes an unfair labor practice. *Id.* § 1101.1201. We further recognize that a proposal to subcontract the work of bargaining unit employees is a mandatory subject for bargaining that triggers the parties' good faith duty. *Pa. Labor Relations Bd. v. Mars Area Sch. Dist.,* 389 A.2d 1073 (Pa. 1978); *Morrisville Sch. Dist. v.*

*PLRB*, 687 A.2d 5, 8 (Pa. Commw. 1996) (explaining that employer has a duty "to bargain in good faith to a bona fide impasse before subcontracting any bargaining unit work").

Indeed, we do not dispute, (nor does the Association), that before actually subcontracting the work of a bargaining unit, under circumstances where doing so is not prohibited by the CBA, an employer's duty to bargain in good faith may include a duty to provide the union with proposals submitted by potential subcontractors. *See* Association's Brief at 44; *see also* PSEA's Amicus Brief at 18 (observing that "the Association agrees wholeheartedly that the District has a bargaining obligation" prior to subcontracting); *Faculty Fed. of Comm. Coll. of Phila. Local 2026, AFT, AFL-CIO v. Phila. Comm. Coll.*, 25 PPER ¶ 25172 (1994) (citing PLRB final orders for the proposition that a public employer desiring to subcontract has an "affirmative duty to seek out the representatives of its employes, announce its intentions and provide the employe representative with relevant information necessary for it to fulfill its bargaining obligation"). However, the District has not met its burden to demonstrate that, under the circumstances of this case, a specific duty to solicit bids and provide them to the Association constitutes "dominant public policy that is ascertained by reference to the laws and legal precedents." *See Westmoreland*, 939 A.2d at 867. It has not shown that any Pennsylvania statute or decision of this Court sets forth a clear requirement regarding the conduct at issue in this case.

Although we are not persuaded that decisions of the PLRB are expressions of binding public policy, the PLRB decisions relied on by the District are inapposite to the case at bar. Here, the relevant and permissible subject of bargaining was not whether to subcontract but whether to eliminate the provision in the CBA that prohibits

subcontracting.[16]  Thus, any duty the District had to bargain in good faith at this juncture was a duty to bargain over the continued inclusion of the no subcontracting provision.  To that end, the arbitrator specifically found:

> The District did not have to advertise, collect and select through the RFP process to try and obtain Association consent through the negotiation process to change or modify the [no subcontracting provision]. [It was] free to broach the subject of changing the language in negotiations without soliciting bids from outside contractors or announcing the same to the Association.

Arbitration Decision, 11/7/2016, at 12; *see id.* at 14 (noting further that "there are obviously many other avenues they could have pursued" in order to obtain information for purposes of cost analysis). The District has not even attempted to argue otherwise, let alone set forth an argument that there is a dominant public policy requiring the issuance of an RFP for purposes of negotiating the **elimination** of a no subcontracting provision.

Based on the arbitrator's interpretation of the CBA, the parties explicitly agreed to limit the District's ability to engage in the subcontracting process.  Thus, when the District issued an RFP, collected bids and shared that information with the Association, it violated a bargained for provision of the CBA.  Even assuming, arguendo, that the duty to bargain in good faith about subcontracting represents a "dominant public policy," it does not follow that the arbitrator's award here compels the District to violate that policy.  The District's proposal to eliminate the no subcontracting provision did not trigger the same set of duties

---

[16] The District itself urged during the arbitration hearing that it had merely commenced "a process to determine whether or not subcontracting can or will occur" and that it had "presented a proposal to eliminate" the no subcontracting provision.  N.T., 8/16/2016, at 11.  The Association conceded that the District had a right to make such a proposal, observing that if the Association "were ever to agree to that, that language would cease to exist."  *Id.* at 25.

that the decision to subcontract would trigger. Pursuant to the arbitration award, the District's freedom to subcontract, including the duties attendant to that pursuit, would arise only following legal impasse or under a successor CBA wherein the no subcontracting provision has been eliminated or modified. *See* PSEA's Amicus Brief at 21.[17]

To this end, we observe that the District's characterization of the arbitrator's award as not merely violative of public policy but also adverse to the Association's interests, evinces a misunderstanding of the award. The award does not, as the District contends, "remove[] [the Association's] ability to negotiate against or to beat the subcontractor's bid." District's Brief at 21 n.5. Instead it protects the Association from having to negotiate against a subcontractor's bid during the pendency of a CBA that prohibits subcontracting.

Moreover, as the arbitration award expressly recognizes, should the parties reach legal impasse, the District could eliminate the no subcontracting provision. Arbitration Decision, 11/7/2016, at 15; *see also* PSEA's Amicus Brief at 21 (explaining that upon impasse, the District could, "consistent with law, implement a final best offer related to [the parties'] agreed upon subcontracting provision") (citing *Morrisville Sch. Dist. v. Pa. Labor Relations Bd.*, 687 A.2d 5 (Pa. Commw. 1996)); *Norwin Sch. Dist. v. Belan*, 507 A.2d 373, 380 n.9 (Pa. 1986) (observing that an "employer may, after bargaining with the union to a deadlock or impasse on an issue, make unilateral changes that are reasonably comprehended within his pre-impasse proposals").

---

[17] Similarly, the arbitration award does not interfere with the District's obligations pursuant to section 528 of the Public School Code. As soon as the District gains the ability to engage in subcontracting, it may choose to pursue that course of action. At that time, it will be required to meet the conditions set forth in section 528. *See* 24 P.S. § 5-528 (requiring a school employer to, inter alia, "solicit applications from third parties" containing specified information, conduct at least one public hearing to present a selected third-party proposal to the public, and receive public comment).

Importantly, if the District unilaterally eliminates the no subcontracting provision upon impasse, the resulting CBA would be different than the one the arbitrator interpreted sub judice. Under this hypothetical, post-impasse CBA, subcontracting would be permissible so long as the District complied with all of the legal duties and obligations discussed hereinabove. *See* Arbitration Decision, 11/7/2016, at 15 (directing that any subcontracting after impasse "would be subject to the applicable Pennsylvania Law, [PLRB] action, and NLRB provisions"); *see also* Association's Reply Brief at 26 (urging that only if the District reached impasse and removed the no subcontracting provision "would the good faith bargaining obligations cited by the District and the Commonwealth Court apply").

In conclusion, we hold that the Commonwealth Court erred in substituting its own interpretation of the contract for the arbitrator's interpretation where the latter rationally derived from the CBA. It erred further in concluding that the arbitration award violated a dominant public policy. Under the highly deferential essence test and its exceptionally narrow public policy exception, when reviewing the propriety of the arbitration award, the Commonwealth Court was required to rely on the arbitrator's findings of fact, including his view that the parties intended to prohibit the process of subcontracting. Because the Commonwealth Court did not adhere to this standard, we reverse.

Chief Justice Saylor and Justices Baer, Todd, Dougherty, Wecht and Mundy join the opinion.