## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Slippery Rock University of Pennsylvania, :
State System of Higher Education, :
                   Petitioner :
                    :
         v. : No. 1667 C.D. 2019
                    : Submitted: September 15, 2020
Association of Pennsylvania State College :
and University Faculty, :
                   Respondent :

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE ELLEN CEISLER, Judge

OPINION
BY PRESIDENT JUDGE LEAVITT                 FILED: October 30, 2020

Slippery Rock University of Pennsylvania and the State System of Higher Education (collectively, University) petition for review of an arbitration award dated November 1, 2019, which sustained the grievance of the Association of Pennsylvania State College and University Faculties (Association)[1] and ordered the University to offer Dr. Rhonda Clark (Grievant) tenure-track status. The University asserts that the arbitration award fails to draw its essence from the 2015-2018 collective bargaining agreement and contravenes well-settled public policy. For the reasons to follow, we affirm the arbitration award.

### I. Factual Background

The University and Association are parties to a collective bargaining agreement dated July 1, 2015, through June 30, 2018.[2] The bargaining unit

---

[1] The caption incorrectly names Respondent as "Association of Pennsylvania State College and University Faculty," instead of "Association of Pennsylvania State College and University Faculties." Since neither party has asked to amend it, we will leave it as is.

[2] The parties agreed to

represented by the Association consists of faculty employed at universities within the State System of Higher Education, including Slippery Rock University of Pennsylvania.

Grievant began working at the University in 2010 as a part-time temporary faculty member in the School of Business. Thereafter, she was offered employment as a full-time, temporary faculty member for the 2011-12 academic year. She continued to work as a full-time, temporary faculty member for the 2012-13 and 2013-14 academic years. For the 2014-15 academic year, however, she was offered a "three-quarters time" position. Reproduced Record at 152a (R.R. __). Thereafter, Grievant worked as a full-time, temporary faculty member for the next three academic years.

Article 11.G.1 of the collective bargaining agreement provides that a temporary faculty member who has worked full time for five consecutive years in the same department will be "offered placement in tenure-track status, if recommended by the majority of the regular department faculty." R.R. 242a-43a. The parties refer to this process as a "conversion."

In April 2018, Grievant learned that the University had deliberately reduced her workload for the 2014-15 academic year in order to render her ineligible for conversion to tenure-track faculty status. In response, Grievant asked the Chair of the School of Business, a department within the College of Business, to hold a vote on her conversion under Article 11.G.1 of the collective bargaining agreement.

---

a one-year successor collective bargaining agreement, effective July 1, 2018[,] through June 30, 2019, the terms of which shall be the same as the July 1, 2015[,] to June 30, 2018[,] agreement, except as modified by the following Articles and Appendices. This agreement must be read in conjunction with the July 1, 2015[,] to June 30, 2018[,] agreement.

Certified Record Item No. 2 at 1.

The majority of the department faculty voted to place Grievant in tenure-track status, but the University refused to do so.

On May 11, 2018, Grievant filed a grievance, protesting the University's refusal to offer her a tenure-track position in the School of Business. The grievance requested that Grievant receive this appointment and be made whole for all monetary losses. The University denied the grievance for the stated reasons that the grievance was untimely and that Grievant had not worked full time for five consecutive academic years, as required by the collective bargaining agreement. The grievance proceeded to arbitration.

The arbitrator held a hearing on July 12, 2019. The issue before the arbitrator was whether the University violated the collective bargaining agreement when it reduced Grievant to a three-quarters time, or 75%, position for the 2014-15 academic year to prevent her becoming eligible for conversion.

The University raised two procedural issues. It first argued that the grievance was untimely under Article 5.C of the collective bargaining agreement because the incident occurred in 2014, and the grievance was not filed until 2018.[3] It next argued that the matter was not arbitrable because the School of Business did not adhere to the provisions of Article 11.G.1 of the collective bargaining agreement when it took a vote and recommended Grievant for tenure-track status.[4]

---

[3] Article 5.C of the collective bargaining agreement, states, in pertinent part, as follows:

> Such written grievance(s) shall be submitted to the President or his/her designee *within forty (40) calendar days of the occurrence* giving rise to the grievance *or within forty (40) calendar days of the date on which the grievant or grievants learned of such occurrence*[.]

R.R. 236a (emphasis added).

[4] Article 11.G.1, which relates to the appointment of faculty, states, in pertinent part, as follows:

> Effective with the spring 2017 semester and each spring semester thereafter, *the University shall provide each department with a listing of temporary faculty who*

3

The Association presented the testimony of three witnesses: Dr. David Culp, Dr. Kurt Schimmel, and Grievant.

Dr. Culp served as Chair of the School of Business from 2003 through 2015, and was responsible for hiring temporary faculty members. He explained that a new hire required final approval of the University's Provost. In 2010, Dr. Culp appointed Grievant to work on a part-time, temporary basis for the 2010-11 academic year. He then appointed her as a full-time, temporary faculty member for the next three academic years. When he requested approval to employ Grievant full time for the 2014-15 academic year, Dr. Schimmel, then the Dean of the College of Business, told him to "amend the request to fill it from a full-time position to a three-quarter[s] time position[,]" because the University was "concerned about [Grievant's] conversion rights." Notes of Testimony, 6/12/2019, at 26-27 (N.T. ___); R.R. 26a-27a. Dr. Culp explained that work was available for a full-time faculty member in the department. Grievant's reduced workload required another faculty member to take on a course overload.

Dr. Culp testified that he preferred to hire the same temporary faculty members from year to year where performance was satisfactory. Grievant's performance evaluations met that standard, and she took on responsibilities not contractually required. For example, Grievant involved herself in student

*have worked five (5) full, consecutive academic years full-time (including the current academic year).* The listing shall be provided to the Department no later than March 1. *The regular department faculty shall hold a vote no later than April 15 to determine whether to recommend tenure-track status for any full-time, temporary faculty member who has worked at a University for five (5) full, consecutive academic years in the same department (including current academic year).* The full-time temporary faculty member shall be offered placement in tenure-track status, if recommended by the majority of the regular department faculty ….

R.R. 242a-43a (emphasis added).

organizations and accepted faculty committee assignments. Dr. Culp acknowledged that he did not tell Grievant in 2014 why her contract for the 2014-15 academic year was for a 75% position. He explained that it was "not [his] responsibility." N.T. 38; R.R. 38a.

Dr. Schimmel is a professor of marketing and previously served as Dean of the College of Business from 2011 until January of 2015. Dr. Schimmel explained that in 2014, the University was seeking accreditation from the Association to Advance Collegiate Schools of Business (AACSB), and the University "did not have sufficient scholarly academically qualified faculty members" to meet the AACSB's standards. N.T. 50; R.R. 50a. Notably, Grievant did not earn her graduate degree from an institution accredited by the AACSB. Dr. Schimmel testified that Dr. Way, the University Provost, informed him that Grievant should not be converted to tenure-track status but, rather, hired to work 75% time. Dr. Schimmel testified that, in April 2018, he spoke with Grievant and "admitted" that her workload for the 2014-15 academic year "had been purposely reduced[.]" N.T. 59; R.R. 59a.

Grievant testified that she has been teaching management classes at the University since August 2010. She explained that in 2014, her only choice was to accept or decline the contract as offered; there was no opportunity to negotiate. Grievant acknowledged that she did not question the 2014 contract terms. In April 2018, she learned from Dr. Schimmel that her 2014 appointment had been fashioned to render her ineligible for conversion to tenure-track status. In response, she requested the Chair of the School of Business to schedule a conversion vote by the faculty, and it voted to offer her tenure-track status. Thereafter, the University

5

informed her that she was ineligible for conversion to tenure-track status because she did not have the required five consecutive years of teaching full time.

The University offered the testimony of Lynne Motyl, its Chief Human Resource Officer. She testified that the University has approximately 900 employees. When a temporary faculty member has completed five years of consecutive full-time status, the University notifies the department, which then must take a vote on conversion. Motyl testified that, in 2018, the University did not notify the School of Business that Grievant was eligible for conversion. She acknowledged that the University administration was not required to give notice to the department of a faculty member's eligibility for conversion.

Dr. Way testified that in 2013, he was hired as Provost and Vice President of Academic Affairs. In that capacity, he did not "get involved in the weeds of faculty workload and assignments." N.T. 122; R.R. 122a. He did not recall directing Dr. Schimmel to appoint Grievant to a 75% position for the 2014-15 academic year.

Finally, Dr. Lawrence Shao, Dean of the College of Business, testified. He was not familiar with Greivant's situation because it occurred before his appointment with the University. He testified that during his tenure as Dean, Dr. Way has not asked him about teaching schedules or faculty workloads.

## II. Arbitration Award

The arbitrator first addressed the University's procedural issues. Article 5.C of the collective bargaining agreement requires a grievance to be filed "within forty (40) calendar days of the date on which the grievant or grievants learned of such occurrence." R.R. 236a. The arbitrator found that in April 2018, Grievant learned of the occurrence, *i.e.*, the intentional reduction in her hours and

6

the University's refusal to recognize the departmental vote on her conversion. Because she filed her grievance in May of 2018, the arbitrator concluded she satisfied the 40-day deadline. The arbitrator rejected the University's claim that Grievant "sat on her rights" and did not exercise "due diligence." Arbitrator's Award at 11. The arbitrator reasoned that because Grievant had no guarantee of employment from one year to the next, she had no reason to investigate her reduction in hours.

The arbitrator rejected the University's claim that the collective bargaining agreement required the department to receive notice from the University before it could vote on a conversion of a temporary faculty member. Although the collective bargaining agreement required the University to prepare a list of faculty eligible for conversion, the arbitrator concluded that this provision does not require the department to await the University's prepared list before holding the vote.[5]

On the merits of the grievance, the arbitrator found that the University intentionally reduced Grievant's hours for the 2014-15 academic year solely to render her ineligible for conversion to tenure-track status. The arbitrator was unpersuaded that the University had a "legitimate business reason" for doing so because the record showed that, in 2014, the University was merely "exploring" the possibility of accreditation by the AACSB. Arbitrator's Award at 31. Further, the arbitrator found that Grievant's lack of a doctorate from an AACSB-accredited university was not essential to accreditation by the AACSB.

The arbitrator sustained the grievance and ordered that Grievant be offered tenure-track status. The arbitrator also ordered the University to pay Grievant the difference between what she would have been paid as a tenure-track

---

[5] The arbitrator also found the language was new to the 2015-2018 agreement.

7

faculty member and what she received as a temporary, full-time faculty member for each academic year from 2016-17 until she was placed in tenure-track status. The arbitrator explained that Grievant would have received the additional compensation had the University not intentionally reduced her workload to make her ineligible for conversion.

The University petitioned for this Court's review.

### III. Appeal

On appeal, the University raises two issues. First, the University argues that the arbitrator's award failed to draw its essence from the collective bargaining agreement. Second, the University argues that the arbitrator's award violated a well-established, defined public policy by promoting Grievant to associate professor, a power exclusively reserved to the University's President.

### A. Scope and Standard of Review

In reviewing an arbitration award, this Court applies the highly deferential two-prong "essence test." *Chambersburg Area School District v. Chambersburg Education Association (Professional)*, 120 A.3d 407, 412 (Pa. Cmwlth. 2015). First, we decide whether the issue is encompassed by the collective bargaining agreement. Second, if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement, it will be sustained. As we have explained:

> We are not required to agree with the arbitrator's interpretation of the [collective bargaining agreement], but we must "look at whether that interpretation and application of the agreement can be reconciled with the language of the agreement. We may vacate an award only if it indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement."

8

*Id.* (quoting *Northumberland County Commissioners v. American Federation of State, County and Municipal Employees, AFL-CIO Local 2016, Council 86*, 71 A.3d 367, 375 (Pa. Cmwlth. 2010)). "[I]n the vast majority of cases, the decision of the arbitrator shall be final and binding upon the parties." *Millcreek Township School District v. Millcreek Township Educational Support Personnel Association*, 210 A.3d 993, 1002 (Pa. 2019) (quotation omitted). The essence test is "a narrow exception to this finality doctrine." *Id.*

The parties do not dispute that the first prong of the essence test is met in this case because the issue is encompassed by the collective bargaining agreement. However, they disagree that the award can be rationally derived from the agreement. The University contends that the arbitrator

> [a]dd[ed] additional terms to the [collective bargaining agreement] that 1) ma[de] all grievances timely by excusing any diligence on behalf of [Grievant] or [the Association] to determine why her status was reduced to part-time; subtract[ed] terms from the [collective bargaining agreement] that 2) permitted the department to take an [Article] 11.G.1 conversion vote without the notice from the University, and then sanctioning the vote as valid; and 3) grant[ed] tenure-track status based upon that conversion vote and order[ed] [Grievant's] promotion from the rank of Instructor to Associate Professor.

University Brief at 26.

In cases where a court finds that the essence test is satisfied, the court may then consider whether the award violates a well-defined and dominant public policy of the Commonwealth. The burden of establishing a violation of public policy rests on the party asserting the public policy exception. *Westmoreland Intermediate Unit # 7 v. Westmoreland Intermediate Unit # 7 Classroom Assistants Educational Support Personnel Association, PSEA/NEA*, 939 A.2d 855, 864 (Pa. 2007).

The Pennsylvania Supreme Court has explained the public policy exception is a "narrow exception to a narrow exception," *i.e.*, the essence test. *Millcreek Township School District*, 210 A.3d at 1011. The Supreme Court has established a three-part test for applying the public policy exception:

> First, a reviewing court must identify precisely what remedy the arbitrator imposed…. Next, the court must inquire into whether that remedy implicates a public policy that is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests…." Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Id.* (citations omitted). Notably, "the arbitrator's interpretation of the contract controls during this entire analysis … and should be upheld absent a clear violation of public policy." *Id.*

### B. Timeliness of Grievance

The University argues that the arbitrator's award cannot be rationally derived from the terms of the collective bargaining agreement because the arbitrator ignored the 40-day deadline in Article 5.C of the collective bargaining agreement by accepting the grievance four years after the occurrence of the grievable event. The Association responds that Article 5.C requires a grievance to be filed "within forty (40) calendar days of the date on which the grievant or grievants *learned* of such occurrence[.]" R.R. 236a (emphasis added). Nevertheless, the University argues that Grievant sat on her rights.

The University directs the Court to *State System of Higher Education v. United Plant Guard Workers of America, Local Union No. 509*, 612 A.2d 645, (Pa. Cmwlth.), *appeal denied*, 618 A.2d 403 (Pa. 1992). There, the collective

bargaining agreement required a grievance to be filed within 15 working days from the date of the occurrence giving rise to the grievance. The arbitrator allowed the grievance, which was filed five years after the date of the grievable event. This Court reversed the arbitrator's award. *United Plant Guard Workers of America* is distinguishable.

There, the collective bargaining agreement required the grievance to be filed within 15 days of the occurrence giving rise to the grievance, regardless of the grievant's knowledge thereof. Here, by contrast, the collective bargaining agreement requires the grievance to be filed within 40 days of the grievant *learning* of the occurrence. R.R. 236a. Grievant did not learn of the grievable occurrence for four years, but she filed her grievance within 40 days of learning of the occurrence.

The arbitrator made a factual determination that Grievant filed her grievance within 40 days of learning of the University's grievable conduct that had occurred in 2014. We hold that the arbitrator's decision regarding the timeliness of the grievance draws its essence from Section 5.C of the collective bargaining agreement.

**C. Conversion Vote**

The University argues that Article 11.G.1 of the collective bargaining agreement conditions the conversion vote upon receipt of a notice from the University of the faculty member's eligibility for conversion. It argues that the arbitrator's decision shows a lack of fidelity to the language of the collective bargaining agreement. The Association responds that the arbitrator considered the two provisions in Article 11 and concluded that "there is simply no language that makes the department's receipt of a notice a requirement before the department can vote." Association Brief at 20 (quoting Arbitrator's Award at 16).

11

Article 11.G.1 of the collective bargaining agreement requires the University to provide "each department with a listing of temporary faculty who have worked five (5) full, consecutive academic years full-time (including the current academic year)." R.R. 242a. Additionally, this provision authorizes the regular department faculty to hold a vote to "recommend tenure-track status for any full-time, temporary faculty member who has worked at a University for five (5) full, consecutive academic years in the same department (including current academic year)." R.R. 243a. The arbitrator reasoned that Article 11.G.1 does not state that the department cannot vote to recommend an eligible temporary full-time faculty member until after the department has received the listing of eligible temporary faculty from the University. This is a rational interpretation of the collective bargaining agreement.

Because the arbitrator's award is rationally derived from the language of the collective bargaining agreement, it draws its essence from the agreement.

### D. Remedy

The University next argues that the arbitrator's remedy did not draw its essence from the collective bargaining agreement. The University characterizes the award as promoting Grievant from the lowest faculty rank of instructor to the rank of associate professor from the 2016-17 academic year forward. University Brief at 37. The University argues that under Article 11.D of the collective bargaining agreement and the applicable statute,[6] only the University President can determine a faculty member's rank and pay.

---

[6] Section 2010-A(1) of the Public School Code of 1949 (Public School Code) states, in pertinent part, as follows:

> Subject to the stated authority of the board and the council, each president shall have the following powers and duties:

The Association responds that Grievant sought to be made whole, which necessarily included an award of back pay reflecting the difference between the salary she received and the salary of a tenure-track faculty member for the period of time she was denied tenure-track status by the University's improper action. The Association contends that the award did not "promote" Grievant. Rather, the arbitrator determined that the University violated the collective bargaining agreement and then fashioned a remedy consistent with the tenure-track position to which Grievant was entitled.

Initially, Grievant requested an offer of full-time, tenure-track status for the fall semester of 2018 and to be made whole for all monetary losses. That request was amended to include the request that the University make Grievant whole and "grant any further relief [as is] necessary to correct the violation." R.R. 139a. Then, at the grievance hearing, counsel for the Association explained the relief requested as follows:

> We think that the remedy must consist of several parts because there needs to be both current and retrospective aspects to the remedy. First, the arbitrator should rule that [Grievant] must be offered the tenure-track appointment that she became entitled to when the department approved her for conversion in April of 2018.
>
> Secondly, because that conversion vote should really have occurred in 2016, if she accepts the conversion to tenure-track

---

(1) Except insofar as such matters are governed by collective bargaining agreements entered pursuant to the act of July 23, 1970 (P.L. 563, No. 195), known as the "Public Employe Relations Act," and subject to the policies of the board, to appoint such employes, professional and noninstructional, graduate assistants, etc. as necessary, to fix the salaries and salary schedules.

Act of March 10, 1949, P.L. 30, *as amended*, added by section 2 of the Act of November 12, 1982, P.L. 660, 24 P.S. §20-2010-A(1).

faculty status … she would have qualified for pay raises and pay increments under the [c]ollective [b]argaining [a]greement, as well as perhaps any other kind of entitlement that she might have received since 2016; and, therefore, your [award] requires a make-whole remedy.

N.T. 10-11; R.R. 10a-11a.  In sum, Grievant sought to be offered tenure-track status and back pay.

Contrary to the University's assertion, the arbitrator did not promote Grievant to the rank of associate professor.  Rather, the award states that, "Grievant is to be immediately offered tenure-track status."  Arbitrator Award at 34.  The arbitrator explained that, "if [Grievant] accepts [tenure-track status], she will be subject to completing the tenure provisions contained in Article 15."  Arbitrator Award at 33.  This is consistent with Article 11.G.2 of the collective bargaining agreement, which states as follows:

A temporary faculty member who is converted to tenure-track pursuant to [Article 11.G.1] shall have until completion of his/her probationary period to attain the requisite qualifications for tenure as described in the appointment letter, including but not limited to minimum qualification for the rank of assistant professor as set forth in applicable laws, as required by Article 15 TENURE, Section B.

R.R. 243a.

The University misapprehends the arbitrator's award of back pay as a determination of Grievant's current status.  The arbitrator had to determine the back pay owed to Grievant and credited Dr. Culp's testimony that newly-hired, tenure-track faculty members "were hired [as] lower to mid-level associates, some a little higher depending on what they were able to negotiate with the dean."  Arbitrator

14

Award at 33 (quoting N.T. 44; R.R. 44a).  Based on that record evidence, the arbitrator ordered that the back pay owed to Grievant was

> the differential in pay between what she received in pay for the academic years since 2016-2017 *and what she should have received as a lower to mid-level associate professor*.  She should also receive overload and summer pay for overload and/or summer course work she taught during that same academic period.  Her retirement contributions should also be increased based on her increased salary.

Arbitrator Award at 33 (emphasis added).  The arbitrator set a minimum and maximum amount of compensation and permitted the parties to negotiate the actual amount.

Importantly, the arbitrator's award of back pay is just for the period of time covered in the grievance, *i.e.*, academic years 2016-17, 2017-18, and 2018-19.  The back pay award is not prospective.  Accordingly, it does not determine Grievant's rank or her current and future yearly compensation as a tenure-track faculty member.  The award left those decisions to the University's President.

It is axiomatic that "an arbitrator must be given latitude and flexibility in fashioning a proper remedy and should not be limited in his or her problem solving to the exact language of the agreement."  *Pennsylvania Turnpike Commission v. Teamsters Local Union No. 250*, 639 A.2d 968, 974 (Pa. Cmwlth. 1994).  The collective bargaining agreement sets no limits on the remedial power of the arbitrator.  Thus, the arbitrator's award of back pay to Grievant neither adds to, subtracts from, nor modifies the provisions of the agreement.  For these reasons, we affirm the arbitrator's award.

15

## E. Public Policy

Finally, the University argues that, even if the arbitrator's award drew its essence from the collective bargaining agreement, it violates public policy and should be vacated. The University contends its President has exclusive authority to appoint faculty to a rank and at such salary as he deems appropriate. There is no authority for anyone else to make such an appointment. The arbitrator's award divested the University President of his exclusive authority to determine Grievant's rank and salary.

The Association responds that parties can bargain away rights in collective bargaining. Here, the University did so by allowing a department's faculty to determine whether a temporary, full-time faculty member will be offered tenure-track status. Additionally, the Association contends that to meet the public policy exception the University had to show that the award violates "laws and legal precedent." Association Brief at 35.

As noted, our Supreme Court has promulgated a three-part test for applying the public policy exception.

> First, a reviewing court must identify precisely what remedy the arbitrator imposed…. Next, the court must inquire into whether that remedy implicates a public policy that is "well-defined, dominant, and ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests…." Finally, the reviewing court must determine if the arbitrator's award compels the employer to violate the implicated policy, given the particular circumstances and the factual findings of the arbitrator.

*Millcreek Township School District*, 210 A.3d at 1011 (citations omitted). Here, the arbitrator ordered the University to offer Grievant tenure-track status.

The University claims that the award violated public policy because it is contrary to law. Section 2010-A(1) of the Public School Code states, in pertinent part, as follows:

> Subject to the stated authority of the board and the council, each president shall have the following powers and duties:
>
> (1) *Except insofar as such matters are governed by collective bargaining agreements entered pursuant to the act of July 23, 1970 (P.L. 563, No. 195), known as the "Public Employe Relations Act,"* and subject to the policies of the board, to appoint such employes, professional and noninstructional, graduate assistants, etc. as necessary, to fix the salaries and salary schedules.

24 P.S. §20-2010-A(1) (emphasis added). Section 2010-A(1) gives the University's president the power to appoint faculty and set their salaries. However, that power may be limited "by collective bargaining agreements…." *Id.*

The parties' collective bargaining agreement specifically sets forth the process for full-time, temporary faculty members to be offered tenure-track status. *See* Article 11.F and 11.G of the Collective Bargaining Agreement; R.R. 242a-43a. Article 11.F contains the "Regulations regarding the hiring of temporary and regular part-time faculty members." Article 11.G.1 provides that "[t]he full-time temporary faculty members *shall be offered* placement in tenure-track status, *if recommended by the majority of the regular department faculty* in accordance with the procedure developed by that department faculty." R.R. 243a (emphasis added). The placement of a temporary faculty member in tenure-track status is not contingent on approval of the University's President. It is a decision made by the regular department faculty members. Thus, the arbitrator's award was consistent with the terms of the collective

17

bargaining agreement and did not violate the terms of Section 2010-A(1) of the Public School Code.

Notwithstanding, the University contends that Article 11.D of the collective bargaining agreement gives the President exclusive authority to make appointments and set salaries. Article 11.D provides as follows:

> If the President agrees with the majority of the regular full-time department faculty's recommendation as to a candidate, he/she shall make the appointment of that candidate to such rank and at such salary as he/she shall deem appropriate.

R.R. 242a.

Article 11 addresses two separate appointments: (1) those made to fill vacancies within departments, *see* Article 11.A-11.E of the Collective Bargaining Agreement; R.R. 241a-42a; and (2) those made for temporary and regular part-time faculty members, *see* Article 11.G-11.F of the Collective Bargaining Agreement; R.R. 242a-43a. Article 11.D gives the University's President authority to appoint a candidate to fill a vacancy and to set the candidate's rank and salary. Grievant, however, was not hired to fill a vacancy within the department. Thus, Article 11.D is not applicable.

In sum, the arbitrator's award requiring the University to offer Grievant tenure-track status, which was recommended by the department faculty and consistent with the terms of the collective bargaining agreement, does not violate a well-defined, dominant public policy.

Accordingly, we affirm the Arbitrator's award.

_____
MARY HANNAH LEAVITT, President Judge

18

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Slippery Rock University of Pennsylvania, : 
State System of Higher Education, : 
          Petitioner : 
           : 
         v. :   No. 1667 C.D. 2019
           : 
Association of Pennsylvania State College : 
and University Faculty, : 
          Respondent : 

## **O R D E R**

AND NOW, this 30th day of October, 2020, the arbitration award dated November 1, 2019, is AFFIRMED.

_____
MARY HANNAH LEAVITT, President Judge